UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
RALPH HOEFFNER, ANTHONY LONGO,
ANTHONY TOMASZEWSKI and
KENNETH REESE, as participants and/or
former participants of the SAND, GRAVEL,
CRUSHED STONE, ASHES AND
MATERIAL YARD WORKERS LOCAL
UNION NO. 1175 LIUNA PENSION FUND
AND WELFARE FUND on behalf of
themselves and all persons similarly situated,

                   Plaintiffs,

             -against-

JOE D'AMATO, FRANK OMBRES,
ALEXANDER MIUCCIO, FRANK P.
DIMENNA and JOHN DOES 1 - 4, in
their capacity as Trustees of the Sand, Gravel,
Crushed Stone, Ashes and Material Yard
Workers Local Union No. 1175 LIUNA
Pension Fund and Welfare Fund,

                  Defendants.
-------------------------------------------------------x

**MEMORANDUM AND ORDER
RULING ON MOTION FOR
PARTIAL SUMMARY JUDGMENT
REGARDING SECTION 1415 TRANSFER**

09-CV-3160 (PKC)(CLP)

PAMELA K. CHEN, United States District Judge:

      In August 2005, Plaintiffs, a group of asphalt plant workers, voted for a change in union

representation, which resulted in Plaintiffs and their employer switching multiemployer pension

plans. A decade-long dispute over whether the old pension plan should have transferred assets to

the new plan, and in what amount, ensued. In January 2012, the Honorable Allyne R. Ross held

that Section 4235 of the Multiemployer Pension Plan Amendments Act (the "MPPAA"), 29 U.S.C.

§ 1415, mandated that the old plan transfer assets and liabilities to the new plan. The old plan

executed this transfer in December 2013, with a follow-up transfer of interest in October 2014.

Presently before this Court is Plaintiffs' motion for partial summary judgment, which disputes the

calculation of the assets transferred by the old plan under the statute. (Dkt. 191.)

# BACKGROUND[1]

The parties' familiarity with the facts of this action is presumed, and the Court summarizes only those facts relevant to the instant motion.

Plaintiffs are unionized employees of College Point Asphalt Corporation ("College Point") who, in August 2005, voted to change their collective bargaining representative from the Material Yard Workers Local Union No. 1175 ("Local 1175") to the United Plant & Production Workers Local 175 ("Local 175"). (Pls.' 56.1 ¶¶ 1, 2.) On December 2, 2005, the National Labor Relations Board ("NLRB") certified the results of this vote. (Defs.' 56.1 Opp. ¶ 46.) Following this certified change in union representation, College Point ceased contributing to the Local 1175 multiemployer pension plan ("Old Plan") and began contributing to the Local 175 multiemployer plan ("New Plan"). (Pls.' 56.1 ¶ 3.) In March 2006, the Old Plan assessed "withdrawal liability" as to College Point in the amount of $166,940, pursuant to Section 4211 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1391 ("Section 1391").[2] (Pls.' 56.1 ¶ 9.) College Point thereafter paid 24 of 29 installments of the withdrawal liability payment. (*Id.*)

In November 2007, those plan participants who had switched to the New Plan as a result of the change in bargaining representative from Local 1175 to Local 175, including Plaintiffs, requested that the Old Plan transfer their "aliquot share of assets" to the New Plan. (Pls.' 56.1 ¶ 11.) In April 2008, they renewed this request. (Pls.' 56.1 ¶ 12.) Defendants refused to transfer

---

[1] The following facts are taken from the parties' 56.1 Statements, hereafter referred to as "Pls.' 56.1" (Dkt. 191-23), "Defs.' 56.1 Opp." (Dkt. 186), and "Pls.' 56.1 Opp." (Dkt. 192-14.). Because the dispute between the parties involves the interpretation of statutory provisions, none of the material facts are in dispute. Unless otherwise noted, a standalone citation to a 56.1 Statement denotes that this Court has deemed the underlying factual allegation undisputed. Any citations to a party's 56.1 Statement incorporates by reference the documents cited therein. Where relevant, however, the Court may cite directly to underlying documents.

[2] The Court refers to ERISA sections by their numbering under Title 29 of the U.S. Code.

any assets. (Pls.' 56.1 ¶ 13.) On July 22, 2009, Plaintiffs filed this putative class action against the Joint Board of Trustees of the Old Plan, alleging that Plaintiffs were entitled to share in the assets of the Old Plan under ERISA's fiduciary provisions.[3] (Pls.' 56.1 ¶ 14.) In March 2011, Plaintiffs amended their complaint to add a cause of action under Section 4235 of the MPPAA, 29 U.S.C. § 1415 ("Section 1415"). (Dkt. 53.) In January 2012, Judge Ross held that Section 1415 mandated a transfer of liabilities and assets from the Old Plan to the New Plan. (Dkt. 72.) On April 19, 2013, this case was assigned to me.

In August 2013, the Old Plan provided notice under Section 1415(b) to College Point of the amounts of assets and liabilities it intended to transfer for the six active College Point employees who had switched from the Old Plan to the New Plan, including Plaintiffs. (Pls.' 56.1 ¶ 24.) Plaintiffs requested leave to move for partial summary judgment, challenging Defendants' calculation of the amount of assets to be transferred under Section 1415. (Dkt. 135.) This Court denied that request without prejudice to Plaintiffs' ability to renew the motion following the transfer. (9/16/2013 Minute Entry.) In December 2013, the Old Plan transferred the vested benefits for six College Point employees (the four Named Plaintiffs, along with Marino Arias and Edward Marencik) to the New Plan, along with $723,759 in assets.[4] (Pls.' 56.1 ¶ 27.) In October

---

[3] The Court notes that the four Named Plaintiffs purport to seek relief on behalf of similarly-situated participants across various employers, all of whom voted to change union representation from Local 1175 to Local 175 in August 2005. No class has yet been certified. As its rulings in this Decision are based on pure issues of statutory interpretation, and should therefore be generally applicable, the Court omits the facts pertaining to the other employers and employees and focuses on the facts relating to Plaintiffs and College Point.

[4] The Old Plan's explanation for how it arrived at this amount is succinctly set forth in the "Affirmation of Enrolled Actuary Susan E. Lee." (Dkt. 189 ("Lee Aff.").) The Court will not summarize those calculations here, though it will refer to them in the course of this opinion. In a December 1, 2015 Order, the Court made clear that it would not be deciding in this opinion whether the Old Plan, in fact, transferred the correct amount of assets and liabilities to the New Plan. Rather, its ruling on the instant motion will be "limited to how the transferred assets and liabilities

2014, the Old Plan transferred an additional sum of $176,072.58, representing prejudgment interest on the December 2013 transfer to account for the delay between 2006 and 2013. (Pls.' 56.1 ¶ 32.)

In September 2015, Plaintiffs filed the present motion challenging the Old Plan's calculation of the amount of assets and liabilities it had transferred to the New Plan. (Dkt. 191.) The Court heard oral argument on Plaintiff's motion on April 8, 2016 and May 23, 2016.

## DISCUSSION

This Court has the dubious honor of ruling on several issues of first impression relating to the interpretation of a fairly obscure or at least, little-analyzed, provision of the MPPAA: Section 1415, which mandates a transfer of assets and liabilities from an old plan to a new plan in the event of a certified change in collective bargaining representative. With respect to the Section 1415 transfer at issue here, the parties dispute: (1) when the transfer obligation was triggered, (2) how to determine the amount of assets and liabilities to be transferred, (3) how College Point's withdrawal liability to the Old Plan should have been reduced following the Section 1415 transfer, and (4) how the eight-year delay in the transfer should be factored into the calculations, if at all.

## I. BACKGROUND ON THE MPPAA & MULTIEMPLOYER PENSION PLANS

It is helpful to begin with a discussion of the MPPAA amendments in 1980 to ERISA. ERISA was enacted in 1974 to "ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984) (citations omitted). Congress wanted to guarantee that "if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions

---

should have been calculated under the relevant statutes. Thus, even if the Court were to conclude that Defendant has the better interpretation of the statutes, the accuracy of its calculations and numbers will be left for determination following summary judgment and expert discovery."

are required to obtain a vested benefit—he actually will receive it." *Id.* (citations omitted). ERISA established the Pension Benefit Guaranty Corporation ("PBGC"), a nonprofit corporation within the Department of Labor, to guarantee the payment of benefits to plan participants and beneficiaries in the event a plan terminates with insufficient assets to support its guaranteed benefits. *Id.* Six years later, Congress enacted the MPPAA in response to concerns that ERISA failed to adequately protect multiemployer pension plans from the adverse consequences of employer withdrawals, which threatened to result in the collapse of numerous multiemployer plans, forcing PBGC to assume obligations in excess of its capacity. *Id.* at 722.

By way of background, multiemployer plans are pension plans that consist of several employers who are obligated to contribute to them pursuant to one or more collective bargaining agreements. Employers make such contributions at rates specified in such agreements, based on, for instance, the hours worked by employees, units of production, or a percentage of employee compensation. Multiemployer plan assets thus consist of employer contributions made pursuant to such collective bargaining agreements and any investment income generated therefrom. Significantly, "[t]he assets of [a multiemployer] plan are not segregated into accounts. The common assets are invested and used to pay pensions to those employees of the participating employers whose rights vest according to the requirements set out in the plan document." *Ganton Techs., Inc. v. Nat'l Indus. Grp. Pension Plan*, 76 F.3d 462, 464 (2d Cir. 1996).[5] A multiemployer plan's liabilities "consist of the payments the plan must make to employees whose rights vest, generally consisting of a stream of payments beginning when an employee reaches a certain age

---

[5] Of note, ERISA specifically states that, except as provided under ERISA, the participating employers have no interest in plan assets. *See* 29 U.S.C. § 1103(c)(1). "This addresses the original motivation for ERISA, namely, the propensity for employers to ransack the assets supporting their private pension plans to the detriment of their pensioners." *Ganton*, 76 F.3d at 464 n.1.

and has retired." *Id.* The Second Circuit has articulated the employer withdrawal problem that the passage of the MPPAA was intended to counteract as follows:

> If an employer withdraws from a plan after its employees' benefits have vested, but before it meets all of its funding obligations, the plan may be left with sizeable unfunded vested liabilities. Prior to the MPPAA, an employer that had paid all required contributions to a multiemployer plan could withdraw from the plan, and if the plan did not terminate within five years after withdrawal, the employer had no further responsibility for the plan's unfunded liabilities. This provided an "undesirable incentive for employers to withdraw from plans and an unfair burden on the employers who continue[d] to maintain the plans."

*T.I.M.E.-DC, Inc. v. Mgmt.-Labor Welfare & Pension Funds, of Local 1730 Int'l Longshoremen's Ass'n*, 756 F.2d 939, 943 (2d Cir. 1985) (citing H.R. Rep. No. 96-869, Part II, 96th Cong., 2d Sess. 10, *reprinted in* 1980 U.S. Code Cong. & Ad. News 2918, 2993, 3001); *see also Pension Benefit Guar. Corp.*, 467 U.S. at 722 n.2 (citing to Congressional testimony describing this problem as a "vicious downward spiral" because the remaining employers would then seek to leave the plan as well to avoid being saddled with higher contribution rates to fund past liabilities).

The key innovation of the MPPAA was the concept of "withdrawal liability": an amount representing the share of the old plan's unfunded vested benefits attributable to a withdrawing employer's participation, to be assessed on the withdrawing employer by the old plan at the time of the withdrawal. The assessment of withdrawal liability ensures that an employer that withdraws from an underfunded multiemployer pension plan does not escape paying for vested benefits that its employees have earned, but that it has not yet funded. *See T.I.M.E.-DC*, 756 F.2d at 944; *Pension Benefit Guar. Corp.*, 467 U.S. at 722 n.2. The rules governing withdrawal liability are set forth in Part 1 of Subtitle E,[6] 29 U.S.C. §§ 1381 to 1405, and apply any time "an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal." 29

---

[6] Subtitle E, 29 U.S.C. §§ 1381 to 1453, is the subtitle added by the MPPAA.

U.S.C. § 1381(a). Section 1381(b) provides that withdrawal liability is the amount computed "under section 1391 of this title to be the allocable amount of unfunded vested benefits," subject to various statutory adjustments in other provisions of Part 1. *Id.* § 1381(b). Thus, Section 1391 is the primary section that sets forth how withdrawal liability should be calculated.

Most significantly for the purposes of this motion, Section 1391(e) provides that in instances where, as an incident of an employer's withdrawal, the old plan will transfer liabilities to a new plan, the employer's withdrawal liability to the old plan must be "reduced in an amount equal to the value, as of the end of the last plan year ending on or before the date of the withdrawal, of the transferred unfunded vested benefits." 29 U.S.C. § 1391(e). The Second Circuit has explained the reduction of withdrawal liability provided for under Section 1391(e) as follows:

> The term "withdrawal liability" simply is a way of describing an employer's obligation, under its collective bargaining agreement, to continue to fund the old plan to the extent that that plan remains responsible to the employees upon their retirement. The statute further requires the old plan to reduce the employer's withdrawal liability based on the amount of assets and liabilities transferred as a result of transferred employees. ***In this way the statute reaches a proper allocation of the employer's payments on behalf of its employees. It ensures that both plans are funded and avoids the possibility of double payments by the employer.***

*T.I.M.E.-DC*, 756 F.2d at 946 (emphasis added). The Second Circuit reiterated this same point later: "[w]hen, as a result of the employer's withdrawal, some employees will participate in a new multiemployer plan, the amount of withdrawal liability that the old plan requests should be reduced by the amount of unfunded vested benefits that it will transfer to the new plan." *Id.*

## II.  STATUTORY FRAMEWORK:  PART 2 OF SUBTITLE E

While Part 1 of Subtitle E, discussed above, governs the assessment of withdrawal liability, Part 2 governs the "mergers and transfers of plan assets or liabilities" and consists of five sections. The last of these sections is the one before the Court today:  Section 1415, entitled "Transfers Pursuant to Change in Bargaining Representative."  However, the Court finds two other sections

to be relevant for the purposes of providing the necessary context for Section 1415: Section 1411, entitled "Mergers and Transfers Between Multiemployer Plans" and Section 1414, entitled "Asset Transfer Rules."[7]  Accordingly, the Court will devote brief discussion to Sections 1411 and 1414 before turning to the parties' disputes surrounding Section 1415.

## A. SECTIONS 1411 & 1414

Although neither party discusses 29 U.S.C. § 1411 or § 1414 in their submissions, the Court finds that both are critical to contextualizing Section 1415.  Together, Sections 1411 and 1414 set forth the rules that govern the transfer of liabilities and assets from one multiemployer plan to another in the absence of the more specific rule enshrined in Section 1415.  The Court finds that discussion of these sections is particularly warranted as Section 1415 specifically contemplates that a plan may opt for a transfer of liabilities and assets in compliance with Sections 1411 and 1414 as an alternative to the transfer rules provided in Section 1415.  *See* 29 U.S.C. § 1415(f)(1).

In relevant part, Section 1411 provides that a plan sponsor may cause a multiemployer plan to engage in a transfer of assets and liabilities to or from another if (1) the proposed transfer complies with regulations of the PBGC (including a 120-day notice requirement), (2) the benefits of participants are not adversely affected, and (3) other statutory conditions are observed.  29 U.S.C. § 1414(b); *see also Vornado, Inc. v. Trustees of the Retail Store Employees' Union Local 1262*, 829 F.2d 416, 420 (3d Cir. 1987).  Separately, Section 1414 provides that any transfer of assets from one multiemployer plan to another need only comply with the asset-transfer rules adopted by the multiemployer plan, provided that those rules (1) "do not unreasonably restrict the

---

[7] The remaining two sections in Part 2 are Section 1412, which governs "Transfers Between a Multiemployer Plan and a Single-Employer Plan" and Section 1413, which governs "Partitions of Eligible Multiemployer plans."  29 U.S.C. §§ 1412, 1413.  The Court does not find either of these two sections to be applicable or informative here and therefore does not discuss them.

transfer of plan assets in connection with the transfer of plan liabilities," and (2) "operate and are applied uniformly with respect to each proposed transfer" (with some reasonable variation in application allowed to account for the financial impact of a proposed transfer on the plan). 29 U.S.C. § 1414(a).

Unlike Section 1415, neither Section 1411 nor 1414 mandates a transfer of liabilities and assets. The Second Circuit, following the lead of the First and Third Circuits, has interpreted Section 1414 to require the transfer of plan assets only when a plan *consents* to a transfer of liabilities and assets. *Ganton*, 76 F.3d 462; *see also Caterino v. Barry*, 8 F.3d 878 (1st Cir. 1993) (Breyer, J.); *Vornado*, 829 F.2d 416. In *Ganton*, the Second Circuit specifically rejected the employer-appellant's interpretation of Section 1414 as requiring a plan to release assets and liabilities associated with an employer upon the request of that employer. The court noted that such a construction "would not only give employers the power to withdraw from plans when they believed they could provide a better pension for their employees . . . but would also entitle the withdrawing employers to take all of the plan assets attributable to their past contributions with them." 76 F.3d at 466. It further noted that "[t]he power of participating employers to separate unilaterally and completely from a multiemployer plan—with respect to past contributions and obligations—is not what Congress intended." *Id.* (citing *Vornado*, 829 F.2d at 420 (noting that such a "shift in initiative from trustee to employer is inconsistent with the thrust of [the MPPAA]")). The court continued:

> It is important to note that employers who believe themselves able to provide better pensions for their employees in another multiemployer plan or in a single-employer plan are not prevented from withdrawing as to future contributions and obligations. Employers are free to withdraw from the plan, as [this employer] did, *but they must start their new plan without the benefit of past contributions unless the plan they leave is willing to transfer assets and liabilities to the new plan.* **To protect the financial stability of multiemployer plans, the plans have the discretion to refuse an employer's request for a transfer of liabilities and assets.**

*Id.* (emphasis added). A multiemployer pension plan's discretion to refuse an employer's request for the transfer of assets and liabilities is subject only to the plan's fiduciary duties. *Id.* In acting in accordance with its fiduciary duty, trustees of a multiemployer plan are "required to balance the interests of the departing employees and the remaining employees," which could well mean refusing the departing employer's transfer request in order to preserve plan assets.[8] *Ganton*, 76 F.3d at 467 (citing *Caterino*, 8 F.3d at 883-85 and *Vornado,* 829 F.2d at 421).

The Court notes, moreover, that even if a plan *were* to consent to a transfer of liabilities, Section 1414 provides that the asset transfer need only comply with asset-transfer rules that "do not unreasonably restrict" the transfer of concomitant assets. 29 U.S.C. § 1414(a)(1). In *Caterino*, for instance, the court upheld an asset-transfer rule (at least, as applied to the specific context before it, where only not-yet-vested liabilities were transferred), which provided that "[i]f any employee or group of employees . . . shall cease to be covered by the Fund for any reason whatsoever, they shall not be entitled to receive any assets of the Fund or portion thereof nor shall

---

[8] The Second Circuit in *Ganton* further observed that an employer and its employees are not necessarily entitled to take out of a multiemployer plan what the employer put in:

> As then-Chief Judge Breyer stated in *Caterino*, multiemployer plans do "*not* guarantee any employee that he will receive a pension that *exactly* reflects all the contributions made on behalf of *that particular employee* over the years." . . . This discrepancy results from one purpose of multiemployer plans, which is to "assure that *all* workers (who work a reasonable number of years) will have a decent pension." . . . The pooling aspect of these plans provides security to all participants at the risk of receiving less than maximum possible benefits. For instance, in *Caterino,* the plaintiffs could have obtained pension rights of $2,600 per month had they formed a single-employer plan, but instead, because of the actuarial characteristics of the employees of the other employers, they earned the right to only $900 per month . . . . The First Circuit recognized, though, that this was the risk the plaintiffs took in exchange for other benefits . . . . Such is the risk inherent in joining a multiemployer plan.

*Ganton*, 76 F.3d at 467–68 (citations to *Caterino* omitted) (emphasis in original).

the Trustees be authorized to make any transfer of assets on behalf of such employees," subject to compliance with ERISA and its fiduciary duty. *Caterino*, 8 F.3d at 880. Then-Chief Judge Breyer further noted in *Caterino* that if the old plan's "no asset transfer" rule cost the new plan too much, "there is a safety valve[:] [t]he employees can automatically entitle themselves to a share of fund assets [under Section 1415] should the matter become so critically important to them that they take the drastic step of changing collective bargaining representatives." *Id.* at 885.

Thus, in the absence of Section 1415, a multiemployer pension plan has *significant* discretion to refuse any transfer of assets and liabilities proposed by a withdrawing employer, and, as a corollary matter, to seek the full amount of the withdrawal liability from the employer instead of coming to some arrangement to transfer unfunded vested benefits off their books to the new plan. In short, the plan holds the cards when it comes to transfers of liabilities and assets. It is through this lens that we must view Section 1415, to which the Court turns next.

## B. SECTION 1415

With respect to interpreting the provisions of Section 1415, the parties dispute three central issues: (1) when the Section 1415 transfer obligation is triggered and the cause of action accrues; (2) whether the amount of assets and liabilities should be valued as of the date the Section 1415 transfer obligation was triggered or as of the date of the ***actual*** transfer in December 2013; and (3) how College Point's withdrawal liability should be reduced following the transfer.

### 1. Section 1415(a): Triggering of Section 1415 Transfer Obligation

The Court first addresses the parties' disagreement as to when the Section 1415 transfer obligation is triggered, which also determines when the instant cause of action accrued. Plaintiffs argue that the certification of the vote to change union representation on December 2, 2005

triggered the obligation; Defendants argue that College Point's signing of a collective bargaining agreement with Local 175 triggers the obligation. The Court agrees with Defendants.

Section 1415(a) mandates the transfer of assets and liabilities from an old plan to a new one where two conditions are met: (1) an employer withdraws from the old plan as a result of a certified change of collective bargaining representative, and (2) "participants of the old plan who are employed by the employer *will, as a result of that change, participate* in another multiemployer plan." 29 U.S.C. § 1415(a) (emphasis added). Interpreting this statutory language, PBGC Opinion Letter 81-27 states—albeit without much discussion—that before the old plan is required to transfer assets and liabilities to the new plan, "employees formerly covered by [the old plan] must begin participation in the [new plan]." (Dkt. 187-36, PBGC Op. Ltr. 81-27 (Aug. 28, 1981)). On an independent reading of Section 1415(a), the Court agrees with the PBGC.[9]

Plaintiffs focus on the "will participate" language of Section 1415(a) as evidence that the Section 1415 transfer obligation is triggered on the date of certification of the union representative vote, when employees are able to anticipate that they will be switching to a new union and new plan. The Court disagrees for two reasons. First, there is no certainty that their employer will even contribute to a new plan on its employees' behalf until it enters into a collective bargaining agreement with the new union representative that provides as much. Indeed, the parties have cited examples from this very action where, despite the certified change in representative, the employer ultimately never signed an agreement with the new representative. Second, even once the employer obligates itself to making contributions to the new plan on behalf of its employees, there

---

[9] *See Vornado*, 829 F.2d at 421 ("The [PBGC's] views have been helpful and informative, but we do not 'defer' to its opinion in the sense that the result we reach is anything other than our own view of the proper interpretation of the statute. We acknowledge our duty to interpret statutory provisions and do not yield that responsibility to an entity outside the judicial branch.").

is no certainty that those employees will meet the new plan's eligibility requirements. Although the Court finds that 100% certainty that those requirements will be met is not necessary, the Court agrees with the district court in *I.A.M. Nat'l Pension Fund Ben. Plan A. v. Cent. States Se. & Sw. Areas Health & Welfare & Pension Funds*, No. 85-cv-1558, 1994 WL 692844 (D.D.C. Nov. 29, 1994), that the employees must at least have "a reasonable expectation of meeting the new plan's eligibility requirements for vested benefits" before it is fair to say that they "will participate" in the new plan.[10] *Id.* at *1-2 (citing to 29 U.S.C. § 1002(7) (defining the term "participant" in a different part of ERISA) and *Firestone Tire and Rubber Co. v. Bruch*, 109 S. Ct. 948, 958 (1989) (interpreting 29 U.S.C. § 1002(7))).

Accordingly, based on the plain language of Section 1415(a) and the persuasive authority of PBGC Opinion Letter 81-21 and *I.A.M. Nat'l Pension Fund*, the Court concludes that the Section 1415 transfer obligation was triggered on the date College Point signed the collective bargaining agreement with Local 175.[11] That is the date on which College Point became obligated to contribute to the New Plan, and ostensibly, also the date on which the eligibility requirements of the New Plan became known, such that it became ascertainable which College Point employees had a reasonable expectation that they could meet them and would be participating in the New Plan. The Court will refer to this date as the "Trigger Date" for the remainder of this opinion.

---

[10] In *I.A.M. National Pension Fund*, the new plan successfully blocked the Section 1415 transfer of liabilities and assets associated with six employees who could not meet the minimum standards of eligibility, *i.e.*, that at least 20 weeks of contributions be made on their behalf, to participate in the new plan because they had retired within weeks of changing plans.

[11] The Court notes that at the oral argument, Plaintiffs' counsel appeared unable to identify the date on which the collective bargaining agreement was signed, because it was not "in the record." (5/23/16 Oral Arg. Tr. 80.) If, for whatever reason, that exact date cannot be determined, the parties should endeavor to agree on the date when: (1) College Point first became obligated under some agreement to make contributions to the New Plan, and (2) the New Plan's eligibility requirements for vested benefits became known, such that it became ascertainable which active College Point employees had a "reasonable expectation" of meeting them.

## 2. Sections 1415(b) & (g)(1): "Appropriate" Amount of Assets and Liabilities

The parties next disagree as to whether, as Plaintiffs contend, the Old Plan should have calculated and valued the assets and liabilities to transfer as of the date the transfer was *actually* made (in December 2013) or, as Defendants contend, the Trigger Date (in 2005-2006, whenever the collective bargaining agreement was signed). Again, the Court agrees with Defendants.

Together, Sections 1415(b) and 1415(g)(1) set forth how to calculate the amounts of assets and liabilities that should be transferred to the new plan and provide a general timeline for doing so. Under Section 1415(b), the employer must notify the old plan of a change in multiemployer plan participation due to Section 1415(a) "no later than 30 days after the employer determines that the change will occur," 29 U.S.C. § 1415(b)(1), which this Court interprets to be within 30 days of the Trigger Date.[12] Upon receiving such notice, the old plan is required to notify the employer of the amount of its withdrawal liability and the amount of assets and liabilities the old plan intends to transfer to the new plan for employees switching over to the new plan. *Id.* § 1415(b)(2)(A). The old plan is similarly obligated to notify the new plan of the amounts of its intended transfer. *Id.* § 1415(b)(2)(B).[13] The new plan then has 60 days to file an appeal with the PBGC to prevent the transfer on the ground that it would suffer "substantial financial harm" as a result of receiving the transfer. *Id.* § 1415(b)(3). If, however, neither the employer nor the new plan objects to the transfer within 60 days of receiving the Section 1415(b)(2) notice,[14] or alternatively, if the new

---

[12] The Court notes, however, that, as Judge Ross previously found, this employer-provided notice is not a condition precedent to the triggering of Section 1415 transfer obligations.

[13] The statute does not, however, provide any time frames or deadlines for the old plan to comply with the Section 1415(b)(2) notice requirements.

[14] While Section 1415(b)(3) suggests an *employer* may also object to a transfer, it is silent on what grounds the employer may object and by when the employer must make such an objection.

plan *does* object, but the PBGC does not make a ruling within 180 days, then Section 1415(b) provides that the old plan "shall transfer the appropriate amount of assets and liabilities" to the new plan.  29 U.S.C. § 1415(b)(3).

Section 1415(g)(1) defines the "appropriate amount" of assets as "the amount by which the value of the nonforfeitable benefits to be transferred exceeds the amount of the employer's withdrawal liability to the old plan (determined under part 1 of this subtitle without regard to section 1391(e) of this title)."  29 U.S.C. § 1415(g)(1).  The Court initially focuses on the first half of this formula.  "Nonforfeitable benefits," which this Court uses interchangeably with "vested benefits" and "liabilities" in this opinion,[15] refers to benefits arising out of a participant's service that have become "unconditional" and "legally enforceable against the plan," in that the participant has completed the required years of service under the plan and has met all the plan's requirements for the benefit.  *See* 29 U.S.C. §§ 1002(19), 1301(a)(8).  Section 1415(g)(1)'s reference to "nonforfeitable benefits *to be transferred*" must be read in conjunction with Section 1415(b)(2)(A)(ii), providing that the old plan is to notify the new plan of its intent to transfer "nonforfeitable benefits of the employees who are no longer working in covered service under the old plan as a result of the change of bargaining representative."  The PBGC has interpreted this

---

[15] The Court recognizes that the two phrases are not identical in every respect.  *See* PBGC Op. 91-2 (Feb. 1, 1991) ("'Nonforfeitable benefits' are not the same as 'vested benefits.'  Benefits become 'vested' when a plan participant has completed the required number of years of service under the plan, and 'vesting' means simply that the participant has the right to receive a retirement benefit even if he or she leaves the service of the employer before retirement age.  A benefit, even though 'vested,' is not considered to be 'nonforfeitable' until the participant has met all the plan's requirements for that particular benefit.") (citing 29 U.S.C. § 1301(a)(8) (defining "nonforfeitable benefit" as "a benefit for which a participant has satisfied the conditions for entitlement under the plan or the requirements of this chapter")).  The Court notes, however, that Congressional reports and debates use "vested" interchangeably with the term "nonforfeitable."  *See Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 367 (1980).  For purposes of this opinion, the interchangeable use of these terms is appropriate.

language to mean that only the nonforfeitable benefits of **active** employees (*i.e.*, not retired or inactive employees) should be transferred in the Section 1415 context. PBGC Op. Ltr. 88-6 (Apr. 1, 1988). The parties do not dispute this aspect of Section 1415, and the Court agrees.

The next part of Section 1415(g)(1) provides that "the amount of the employer's withdrawal liability to the old plan (determined under part 1 of this subtitle without regard to section 1391(e) of this title)" is deducted from the nonforfeitable benefits of active employees to be transferred, to determine the "appropriate amount of assets." 29 U.S.C. § 1451(g)(1) ("'appropriate amount of assets' means the amount by which the value of the nonforfeitable benefits to be transferred *exceeds* the amount of the employer's withdrawal liability to the old plan") (emphasis added). As explained above, the withdrawal liability represents the total amount of **unfunded** vested benefits allocable to a withdrawing employer, and it is always determined under Part 1 of Subtitle E, namely 29 U.S.C. §§ 1381(b) and 1391, at the time of an employer's withdrawal from the old plan. The Court finds that the phrase "without regard to section 1391(e)" means simply that the withdrawal liability amount to use for purposes of the Section 1415(g)(1) formula should be the normal amount of withdrawal liability that is calculated under Section 1391 and *not* reduced by the amount of unfunded vested benefits to be transferred, as contemplated in Section 1391(e). Here, the undisputed amount of the withdrawal liability is $166,940. Section 1415(g)(1) thus provides that this full $166,940 amount should be subtracted from the amount of the vested benefits associated with the six active College Point employees transferred to the New Plan, in order to arrive at the appropriate amount of assets to transfer.

Finally, Section 1415(g)(1) provides that the withdrawal liability amount is to be deducted from the "value of the nonforfeitable benefits to be transferred," without specifying the date on which those nonforfeitable benefits should be valued. The parties disagree as to the date on which

liabilities should be valued. Plaintiffs argue that the liabilities should be valued as of the date of the actual transfer in December 2013; Defendants argue that even if calculated on the Trigger Date, they should be valued as of the end of the plan year preceding withdrawal, June 30, 2005, since that is the date as of which the withdrawal liability is determined. The Court finds, however, that Defendants' "apples-to-apples" type argument is not supported by the language of the statute, in view of the language Congress used in Section 1391(e). Section 1391(e)—which, like Section 1415(g)(1), sets forth a calculation method that involves both withdrawal liability and transferred vested benefits—*explicitly provides* that the "transferred unfunded vested benefits" to be deducted from the withdrawal liability amount should *themselves* be valued "as of the end of the last plan year on or before the date of withdrawal." 29 U.S.C. § 1391(e). Thus, Congress clearly knew how to include language specifying that transferred liabilities should **also** be calculated as of the end of the last plan year preceding the transfer, yet did not do so in Section 1415(g)(1). Accordingly, the Court finds that instead of valuing liabilities to be transferred as of June 30, 2005, the Old Plan should value them as of the Trigger Date.[16]

### 3. Section 1415(c): Reduction in Withdrawal Liability

The Court now reaches the most vigorously disputed part of this motion: the amount by which College Point's withdrawal liability should be reduced following the Section 1415 transfer.

---

[16] The Court rejects out of hand all of Plaintiffs' arguments about why the liabilities to be transferred should be valued as of the date of the actual transfer in December 2013. Plaintiffs argue, for instance, that valuing the liabilities to be transferred as of the Trigger Date "adds layers of needless complexity" by creating the need to account for changes and events since that time. But courts are more than competent in determining the amount of interest to compensate for such delay in order to place parties in the positions they would have been in. Plaintiffs also argue that its "actual transfer date" approach avoids the potential for gamesmanship by the parties. To the contrary, this Court finds that *Plaintiffs'* approach is the one that would allow for gamesmanship: instead of having the valuations be pegged to a determinable date defined by the statute, which this Court has termed the Trigger Date, Plaintiffs' approach would allow old plans to alter the 1415(g)(1) valuations simply by choosing when to make a transfer.

As an initial matter, the parties dispute whether Section 1391(e) or Section 1415(c) applies. As the Court discussed above, Section 1391(e), which is entitled "[r]eduction of liability of withdrawn employer in case of transfer of liabilities to another plan incident to withdrawal or partial withdrawal of employer," provides generally that when, as a result of the employer's withdrawal, some employees will participate in a new multiemployer plan, the amount of the employer's withdrawal liability to the old plan should be reduced by the amount of unfunded vested benefits transferred to the new plan. By contrast, Section 1415(c), which is entitled "[r]eduction of amount of withdrawal liability of employer upon transfer of appropriate amount of assets and liabilities by plan sponsor of old plan to new plan," provides:

> If the plan sponsor of the old plan transfers the appropriate amount of assets and liabilities under this section to the new plan, then the amount of the employer's withdrawal liability (as determined under section 1381(b) of this title without regard to such transfer and this section) with respect to the old plan shall be ***reduced by the amount by which*** —
>
> > (1) the value of the unfunded vested benefits allocable to the employer which were transferred by the plan sponsor of the old plan to the new plan, ***exceeds***
> >
> > (2) the value of the assets transferred.

29 U.S.C. § 1415(c). It is a basic canon of statutory interpretation that where two statutory provisions conflict—and the Court finds that Section 1391(e) and Section 1415(c) do conflict here for reasons discussed below—the more specific provision applies. *See Greene v. United States*, 79 F.3d 1348, 1355 (2d Cir. 1996) ("When two statutes are in conflict, that statute which addresses the matter in specific terms controls over a statute which addresses the issue in general terms, unless Congress has manifested a contrary aim."). Given Section 1415(c)'s plain language, its

title, and the structure of the statute as a whole,[17] the Court finds it patently clear that Section 1415(c), and not 1391(e), governs the reduction of withdrawal liability in the context of Section 1415 transfers.  The Court moves to the parties' dispute over the interpretation of that provision.

"[S]tatutory interpretation must begin with the plain language, giving all undefined terms their ordinary meaning while attempting to ascertain how a reasonable reader would understand the statutory text, considered as a whole." *Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*, 810 F.3d 861, 868 (2d Cir. 2015) (alterations and internal quotation marks omitted).  "[I]f statutory language is plain, we must enforce it according to its terms." *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 623 (2d Cir. 2015) (citing *Hardt v. Reliance Standard Life Ins. Co.,* 560 U.S. 242, 251 (2010)).  However, "when deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme." *Id.* (quoting *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (internal quotation marks omitted)).  Courts "must also strive to avoid interpretations of a statute that would render any phrase or provision superfluous." *Clapper*, 804 F.3d at 623 (citation omitted).  Accordingly, the Court starts with the plain language of Section 1415(c) before examining its place in the greater context of the statute as a whole.

*Plain Language.*  The Court finds both that the language of Section 1415(c) is clear and that it yields a different result than Section 1391(e) with respect to the calculation of the withdrawal liability reduction.  The text of the two statutes are set forth side-by-side below for easy reference:

---

[17] Indeed, this interpretation finds further support in the specific instruction in Section 1415(f)(1) providing that even if the employer and plan opt for a transfer of assets and liabilities under the terms of Sections 1411 and 1414 instead of using the transfer formula in 1415(g)(1), the employer's withdrawal liability to the old plan "shall be reduced under [1415(c)] as if assets and liabilities had been transferred in accordance with [Section 1415]," with the implication being that this is *as opposed to the default rule found in Section 1391(e) that would otherwise govern*.  29 U.S.C. § 1415(f)(1).

| 1415(c) Reduction of amount of withdrawal liability of employer upon transfer of appropriate amount of assets and liabilities by plan sponsor of old plan to new plan | 1391(e) Reduction of liability of withdrawn employer in case of transfer of liabilities to another plan incident to withdrawal or partial withdrawal of employer |
|---|---|
| If the plan sponsor of the old plan transfers the appropriate amount of assets and liabilities under this section to the new plan, then the amount of the employer's withdrawal liability (as determined under section 1381(b) of this title without regard to such transfer and this section) with respect to the old plan shall be *reduced by the amount by which* —<br><br>(1) the value of the unfunded vested benefits allocable to the employer which were transferred by the plan sponsor of the old plan to the new plan,<br><br>*exceeds*<br><br>(2) the value of the assets transferred. | In the case of a transfer of liabilities to another plan incident to an employer's withdrawal or partial withdrawal, the withdrawn employer's liability under this part shall be reduced in an amount equal to the value, as of the end of the last plan year ending on or before the date of the withdrawal, of the transferred unfunded vested benefits. |

The Court focuses first on the phrase in Section 1415(c), "the amount of the employer's withdrawal liability (as determined under section 1381(b) of this title without regard to such transfer and this section) with respect to the old plan." This is the amount from which a reduction is to be taken under Section 1415(c). The Court concludes that this phrase is synonymous with "the withdrawn employer's liability under [Part 1]" found in Section 1391(e), from which the reduction provided for there is to be taken.[18] Thus, both Sections 1391(e) and 1415(c) provide methods for calculating the reduction to be taken from the withdrawal liability amount.

---

[18] As the Court previously noted, Section 1381(b) is simply the general provision in Part 1 establishing that withdrawal liability should be calculated under Part 1. Thus, "under section 1381(b)" means the same as "under Part 1."

Section 1415(c) then provides that following a Section 1415 transfer of assets and liabilities, the withdrawal liability amount should be reduced by the amount by which "the value of the unfunded vested benefits allocable to the employer which were transferred by the plan sponsor of the old plan to the new plan" *exceeds* "the value of the assets transferred."  The Court finds that the first of these two phrases is synonymous with "the value . . . of the transferred unfunded vested benefits" found in Section 1391(e), even though the latter does not contain the phrase "allocable to the employer."  Because an old plan would not be transferring the unfunded vested benefits associated with *other employers* to a new plan, the Court concludes that "the value . . . of the transferred unfunded vested benefits" *necessarily* refers to those unfunded vested benefits allocable to the withdrawing employer that are being transferred.

Section 1415(c) thus provides for a very different reduction than Section 1391(e).  Whereas Section 1391(e) provides that the withdrawal liability should be reduced by the *entire amount of* transferred unfunded vested benefits (which the court will refer to as "UVBs" in this portion of the opinion), Section 1415(c) provides that withdrawal liability should be reduced by the *difference* between the amount of transferred UVBs and the amount of transferred assets.  Accordingly, whereas Section 1391(e) would often seem to result in the total (or near-total) wiping out of withdrawal liability owed to the old plan following a transfer of UVBs, Section 1415(c) contemplates a *significantly smaller* reduction of withdrawal liability under what appears at first blush to be identical circumstances.  Before the Court addresses why this makes sense, the Court finds it helpful at this point to walk through the numbers in the *Green Gold* arbitration decision (submitted by Plaintiffs as supplemental authority, *see* Dkt. 224-1[19]), as an illustration of the differences between applying Section 1391(e) and 1415(c).

---

[19] *In the Matter of the Arbitration Between Green Gold Development Corp. and Pavers*

In *Green Gold*, the old plan assessed withdrawal liability in the amount of $159,287 for the withdrawing employer, Green Gold. The old plan thereupon transferred $315,388 in liabilities and $156,101 in assets (representing liabilities minus withdrawal liability, per § 1415(g)(1)) to the new plan. Green Gold—taking the same position Plaintiffs take here—contended that its withdrawal liability should then have been reduced **by $159,287 under Section 1391(e)**, representing the full amount of transferred UVBs—and resulting in $0 owed to the old plan. However, the old plan instead reduced the amount of Green Gold's withdrawal liability **by $3,186 under Section 1415(c)**, representing the amount by which the transferred UVBs ($159,287) *exceeded* the amount of transferred assets ($156,101). Thus, under Section 1415(c), Green Gold still owed $156,101 ($159,287 - $3,186) to the old plan. The Arbitrator ultimately found that Section 1415(c), and not Section 1391(e) applied, but gave a tortured interpretation of Section 1415(c), under which it found that the withdrawal liability should have been reduced to $0. However, the Court finds that the old plan's interpretation of Section 1415(c) in *Green Gold* more accurately followed the plain language and declines to follow the Arbitrator's interpretation.[20]

***Structure and Context.*** Continuing with the previous example, Green Gold, making the same argument Plaintiffs make here, argued that it made no sense for it to still owe $156,101 to

---

*and Road Builders District Council Pension Fund*, Case 01-14-0000-3662.

[20] The *Green Gold* Arbitrator broke withdrawal liability down into two components: (1) the portion of UVBs attributable to employees transferring to the new plan (which he termed "unfunded transferred liabilities"), and (2) the portion of UVBs attributable to retired or otherwise non-active employees remaining with the old plan (which he termed "unfunded orphan liabilities"). The Arbitrator held that under Section 1415(c), the old plan should calculate the amount called for by the formula in 1415(c)(1) (here, $3,186) and deduct it—not from the *Original WL—but from the unfunded orphan liabilities*. Applying this interpretation, the Arbitrator concluded that because no "unfunded orphan liabilities" remained with the old plan, there was no Section 1415(c) reduction from that amount to be had and Green Gold owed no withdrawal liability to the old plan. The Court finds that this interpretation contradicts the plain language of Section 1415(c) that the reduction should be taken from "the amount of the employer's withdrawal liability [determined under section 1381(b)] *without regard to such transfer and this section*."

the old plan under a literal application of Section 1415(c), since the old plan had transferred *all* UVBs attributable to Green Gold to the new plan and was no longer responsible for them. Indeed, in *Green Gold*, it was undisputed that no UVBs remained with the old plan.[21] Green Gold and Plaintiffs here thus contend that Section 1415(c) cannot **possibly** mean what it says because that would result in a windfall to the old plan: it can wipe UVBs from its books and **still** receive a hefty sum—supposedly intended to compensate it for those same UVBs—from the employer.

Plaintiffs' argument is facially appealing. But the Court concludes that there is, in fact, a principled reason why Section 1415(c) yields such a different outcome than Section 1391(e). The Court observes that the fact that the amount owed by Green Gold following the 1415(c) reduction is identical to the amount of assets the old plan transferred is no coincidence. The calculation found in Section 1415(c) can be expressed as follows:

| Amount Owed By Employer to Old Plan After Section 1415 Transfer Under 1415(c) | = | Withdrawal Liability | − | Portion of WL Transferred (*i.e.,* transferred UVBs) | − | Assets Transferred |
|---|---|---|---|---|---|---|

And it yields the following results: If **all** UVBs allocable to the employer are transferred—meaning that 100% of the withdrawal liability is transferred—then the employer must compensate the old plan for the amount of assets it transferred.[22] On the other hand, if only **some** of the UVBs are transferred (say two-thirds), then the calculation provides that the employer must compensate

---

[21] By contrast, it appears that some unfunded vested benefits remain with the Old Plan in the instant case, relating to inactive or retired employees.

[22] In other words, the above expression simplifies to:
WL – WL + Assets Transferred = Assets Transferred

the old plan for any UVBs remaining with the old plan (*e.g.*, for retired or inactive participants) *plus* the amount of assets the old plan transferred.[23]

The Court finds that these outcomes make sense in light of Sections 1411 and 1414. In the absence of Section 1415, an old plan can always opt to refuse a withdrawing employer's request for a transfer of liabilities and assets and instead simply compel the employer to compensate it in the full amount of its withdrawal liability. Because Section 1415 takes this option away from the old plan and *compels* it to transfer liabilities and assets associated with a withdrawing employer, it makes sense that Section 1415(c) not only requires the employer to compensate the old plan for any UVBs remaining on the old plan's books (as Section 1391(e) does), but *also* to reimburse the old plan in the amount of assets the old plan was forced to release.[24]

For the foregoing reasons, the Court finds that the plain language of Section 1415(c) is clear, and that its interpretation is supported by the structure and context of the statute.[25]

---

[23] In other words, the above expression simplifies to:

$$WL - (2/3)WL + \text{Assets Transferred} = (1/3)WL + \text{Assets Transferred}$$

[24] The focus on the health of the old plan is further supported by Section 1415(e), which contemplates a transfer of limited liabilities (capped at the withdrawal liability amount) without any corresponding transfer of assets where the old plan is in reorganization or the transfer would cause the old plan to go into reorganization.

[25] The Court notes that neither *T.I.M.E.-DC*, 756 F.2d 939, and *Hazel Park Racing Ass'n, Inc. v. Trustees of the SEIU Nat. Indus. Pension Fund*, 543 F. Supp. 2d 741, 748-49 (E.D. Mich. 2008), cited by Plaintiffs in support of their interpretation that Section 1415(c) means the same as Section 1391(e), discussed or interpreted Section 1415(c) in any detail. Similarly, the Court notes that PBGC Opinion Letter 86-7, also cited by Plaintiffs, contains a statement that: "[u]nder section 4235(c), the employer's withdrawal liability [to the old plan] . . . is reduced to the extent the plan sponsor transfers to the new plan unfunded vested benefits allocable to the employer." However, the opinion letter made the statement without discussion or elaboration, and in the course of addressing the question of whether an employer who has ceased making contributions to a plan following a union decertification is subject to withdrawal liability. Accordingly, the Court does not find *T.I.M.E.-DC*, *Hazel Park*, or PBGC Op. Ltr. 86-7 persuasive on this issue.

### III.    ACCOUNTING FOR TIME LAPSE

The Court now addresses ways in which the eight-year delay affected the amounts of liabilities and assets transferred to the New Plan and how the Old Plan should account for them.

### A.  WITHDRAWAL LIABILITY OVERPAYMENTS (IF ANY)

Since March 2006, College Point has made payments on 24 of 29 installments of its withdrawal liability to the Old Plan.  To the extent that the amount that College Point paid the Old Plan exceeded the amount of withdrawal liability it owed the Old Plan after the Section 1415(c) reduction described in the previous section, the Court holds that the amount of this overpayment should be refunded to College Point.  The Court notes, however, that there may be no reduction under Section 1415(c) at all, if Defendants' calculations on that score are correct.  (Lee Aff. ¶ 24.)

### B.  LIABILITIES PAID OUT BY OLD PLAN IN INTERIM

On April 1, 2013, one of the six College Point employees, Kenneth Reese, retired.  Between April 1, 2013 and the transfer date in December 2013, the Old Plan made monthly pension payments for Reese.  To account for these payments made by the Old Plan—which would have been made by the *New Plan* had the Section 1415 transfer been timely—Defendants calculated the present value of the payments the Old Plan made to Reese between April 1, 2013 and December 31, 2013 as of June 30, 2005 and deducted this amount from the "nonforfeitable benefits to be transferred" amount in the Section 1415(g)(1) formula.  (Defs.' Ex. 44; *see also* Lee Aff. ¶ 21.) This results in a corresponding reduction in the amount of assets transferred.

The Court agrees with Defendants that this deduction from the amount of liabilities and assets transferred is appropriate, except that the present value of these payments should be calculated as of the Trigger Date, not June 30, 2005, for the reasons discussed above with respect

to the calculation of assets and liabilities. The few monthly payments that the Old Plan made for Reese are benefits that do not need to be paid again by the New Plan.

### C. INVESTMENT INCOME EARNED BY OLD PLAN ON ASSETS

Finally, the parties dispute what the appropriate interest rate should be. Plaintiffs urge that the Old Plan should not be permitted to turn a profit on wrongdoing—*i.e.*, to generate investment income from assets that it should not have been holding onto—and seeks an interest rate that is equal to the New Plan's investment rate of return between 2006 and 2013. Defendants argue that the governing principle is that Plaintiffs should be made whole and that Plaintiffs are entitled only to the rate of return that they would have seen—and in fact, *did* see, with their own investments— had the transfer occurred back in 2005 or 2006 on the Trigger Date.

The Court agrees with Defendants that the interest rate should "fairly represent[] the [New Fund's] normal return on investment." *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270 (2d Cir. 1992) (citation omitted), *overruled on other grounds, Gerosa v. Savasta & Co.*, 329 F.3d 317 (2d Cir. 2003) (noting, albeit in the context of a different ERISA provision, that "[p]rejudgment interest is not intended to penalize the trustee but serves as compensation for the use of money withheld . . . . [h]ence, such an award must be made with an eye toward putting the plan in the position it would have occupied but for the breach"). However, the Court finds that there may be a question of fact as to whether, as Plaintiffs argue, the New Plan's investment rate of return would have been higher had it received the asset transfer when it was supposed to, on the theory that the New Plan would have been less risk-averse, or whether as Defendants argue, Plaintiffs investment strategy would not have changed.

### IV. PLAINTIFFS' STANDING

Finally, the Court notes that while it originally voiced concerns about Plaintiffs' standing

to enforce Section 1415, the Court is now satisfied that they do have standing. To have standing under ERISA, a plaintiff must both "assert a constitutionally sufficient injury arising from the breach of a statutorily imposed duty" and "identify a statutory endorsement of the action." *Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 118 (2d Cir. 2009); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014) (clarifying that "statutory standing" is not, in fact, a standing issue, but a question of whether the particular plaintiff "has a cause of action under the statute"). The Court finds that Plaintiffs meet both.

Plaintiffs clearly have an interest in enforcing a Section 1415 transfer in the first place in order to bring their past service credits over to the new plan and to ensure that the new plan has received all the assets to which it is statutorily entitled. *See Caterino*, 8 F.3d at 882 (finding plan participants possessed standing to challenge rule blocking the transfer of assets to their new fund, because their fund would be "a poorer fund" as a result of that rule). Indeed, in *Caterino*, then-Chief Judge Breyer *explicitly* suggested that voting for a new bargaining representative in order to trigger a Section 1415 transfer could be a mechanism by which employees seeking to switch plans can "automatically entitle themselves to a share of fund assets." *Id.* at 885. Because the Court finds that Plaintiffs have standing to compel the Section 1415 transfer of their vested benefits and concomitant assets, it finds that they necessarily may enforce the correct *calculation* of the same. It would be an absurd result if Plaintiffs could sue to compel a Section 1415 transfer, yet somehow be without standing to ensure that the proper amounts are transferred.

Finally, a statutory cause of action exists: Section 1451(a)(1) specifically authorizes a cause of action for a "plan participant . . . who is adversely affected by the act or omission of any party" under the MPPAA with respect to a multiemployer plan. 29 U.S.C. § 1451(a)(1); *see also I.A.M. Nat. Pension Fund Benefit Plan A v. Cent. States S.E. & S.W. Areas Health & Welfare &*

*Pension Funds*, 830 F.2d 1163, 1167 (D.C. Cir. 1987) (finding that a *plan* may assert an accounting claim against an old plan to challenge the calculation of a Section 1415 transfer, noting that "there is present in the statutory language and in the underlying statutory purpose the implication that a new plan is not bound by the calculations of assets and liabilities computed by the old plan").

## CONCLUSION

The Court has interpreted Section 1415 and ruled on: (1) how to calculate the amount of assets that should have been transferred under Section 1415; (2) the date on which the cause of action is considered to have accrued; (3) the appropriate interest rate to use to account for the eight-year delay in the transfer and how the account for benefits paid in the interim; and (4) how College Point's withdrawal liability should have been reduced as a result of the transfer. The parties will now have the opportunity to apply these rulings to calculate the correct amount of assets and corresponding interest that the New Plan should have received.

The parties should use their best efforts to reach agreement on the calculations. However, in the event that further proceedings are necessary, the parties should filed a letter advising the Court of the issues that need to be resolved. In any event, the parties shall submit a joint status report no later than October 31, 2016.


SO ORDERED.


                                              */s/ Pamela K. Chen*
                                              Pamela K. Chen
                                              United States District Judge


Dated: Brooklyn, New York
          September 30, 2016