UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
RALPH HOEFFNER, ANTHONY LONGO,
ANTHONY TOMASZEWSKI and
KENNETH REESE, as participants and/or
former participants of the SAND, GRAVEL,
CRUSHED STONE, ASHES AND
MATERIAL YARD WORKERS LOCAL
UNION NO. 1175 LIUNA PENSION FUND
AND WELFARE FUND, on behalf of
themselves and all persons similarly situated,

                     Plaintiffs,

            - against -

JOE D'AMATO, FRANK OMBRES,
ALEXANDER MIUCCIO, FRANK P.
DIMENNA and JOHN DOES 1 - 4, in
their capacity as Trustees of the Sand, Gravel,
Crushed Stone, Ashes and Material Yard
Workers Local Union No. 1175 LIUNA
Pension Fund and Welfare Fund,

                    Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
09-CV-3160 (PKC) (CLP)

PAMELA K. CHEN, United States District Judge:

      Plaintiffs Ralph Hoeffner, Anthony Longo, Anthony Tomaszewski and Kenneth Reese

(collectively, "Named Plaintiffs") are four asphalt plant workers employed by the College Point

Asphalt Corporation ("College Point"). They bring this putative class action against Defendants,

who are Trustees of the Sand, Gravel, Crushed Stone, Ashes and Material Yard Workers Local

1175 Pension Fund and Welfare Fund (collectively, "the Local 1175 Funds," and respectively,

"the Local 1175 Pension Fund" and "the Local 1175 Welfare Fund"). Named Plaintiffs seek to

force the transfer of certain assets from the Local 1175 Funds to corresponding pension and welfare

funds maintained by the United Plant and Production Workers Local 175 (collectively, "the Local

175 Funds," and respectively, "the Local 175 Pension Fund" and "the Local 175 Welfare Fund").

Before the Court are Named Plaintiffs' motion for class certification (Dkt. 287) and Defendants' motion to strike two expert reports and an affidavit submitted by Named Plaintiffs in support of class certification (Dkt. 291). For the reasons that follow, the Court certifies a pension subclass and a welfare subclass in this action, and denies Defendants' motion to strike as moot.

## BACKGROUND

The parties' familiarity with the facts of this complex action is presumed, and the Court summarizes only those facts relevant to the motions currently under consideration.

### I.    Factual Background

Named Plaintiffs and other workers employed by College Point voted to change their collective bargaining representative in August 2005, switching from the Sand, Gravel, Crushed Stone, Ashes, and Material Yard Workers Local 1175 ("Local 1175") to the United Plant and Production Workers Local 175 ("Local 175"). (Amended Complaint ("Am. Compl."), Dkt. 53, ¶ 32; Declaration of Barbara Mehlsack ("Mehlsack Decl."), Dkt. 290, ¶¶ 55, 58.) Following this certified change in union representation, College Point ceased contributing to both the Local 1175 Pension and Welfare Funds on behalf of its employees and began making contributions to the Local 175 Pension and Welfare Funds. (Am. Compl., Dkt. 53, ¶ 32; Mehlsack Decl., Dkt. 290, ¶ 58.) In parallel, employees of Grace Industries, Inc. ("Grace") and Willets Point Asphalt Corporation ("Willets Point") also voted to change their collective bargaining representative from Local 1175 to Local 175 in August 2005, and switched between the same pension and welfare funds. (Mehlsack Decl., Dkt. 290, ¶ 56–58; January 13, 2012 Order by Judge Allyne R. Ross ("2012 Order"), Dkt. 72, at 3.)

These changes spawned a more than decade-long dispute over whether, and in what amount, the Local 1175 Funds should have transferred shares of their assets to the Named Plaintiffs' newly adopted Local 175 Funds. In November 2007, counsel Benjamin A. Karfunkel,

acting on behalf of former participants in the Local 1175 Funds who had switched to the Local 175 Funds, made a formal request to Defendants to transfer the former Local 1175 Fund participants' aliquot share of assets to the corresponding Local 175 Funds. (Defendants' Exhibit ("Defs.' Ex.") 2, Dkt. 290-2, at ECF[1] 2; Defs.' Ex. 3, Dkt. 290-3, at ECF 2–3.) In an April 9, 2008 letter, Defendants refused to initiate the requested transfer, laying the ground for this litigation. (2012 Order, Dkt. 72, at 3–4; Named Plaintiffs' Exhibit ("Pls.' Ex.") K, Dkt. 67-2, at ECF 43–44.)

## II.    Procedural History

On July 22, 2009, Named Plaintiffs filed the initial complaint in this action. (Dkt. 1.) The complaint was amended on March 21, 2011 to assert, *inter alia*, a class action on behalf of "all participants and/or former participants in the Local 1175 Funds who by reason of representation elections or agreements had become participants in the Local 175 Funds at or before the time of judgment and have not had transferred to the Local 175 Funds their aliquot share of the Local 1175 Fund assets." (Am. Compl., Dkt. 53, ¶ 23.) The amended complaint proposed two subclasses, a pension class and a welfare class, to be based on prior participation in the Local 1175 Pension Fund and the Local 1175 Welfare Fund. (*Id.* ¶ 24.)

On January 13, 2012, the Honorable Allyne R. Ross[2] issued an opinion granting in part and denying in part the parties' dueling motions for summary judgment. (2012 Order, Dkt. 72.) In her opinion, Judge Ross determined that a transfer of pension assets and liabilities from the Local 1175 Pension Fund to the Local 175 Pension Fund was mandated by 29 U.S.C. § 1415. (*Id.* at 13–18.) She further found that 29 U.S.C. § 1103(c)(1)'s requirement that the assets of a welfare benefits

---

[1] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system, not the document's internal pagination.

[2] This matter was originally assigned to Judge Ross.

plan "be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries," as interpreted by the Second Circuit in *Trapani v. Consolidated Edison Employees' Mutual Aid Society*, 891 F.2d 48 (2d Cir. 1989), entitles a successor fund, *e.g.*, the Local 175 Welfare Fund, to an aliquot share of the assets of an old fund's departing participants if all of the employees of a single employer change their bargaining representative and equitable considerations favor the transfer of funds. (*Id.* at 9–12.) Judge Ross later withdrew her decision because she found the motions for summary judgment to be premature, but she did not reconsider the merits of the opinion. (Order of Withdrawal, Dkt. 90.) In withdrawing her decision, Judge Ross stated that she "cannot not conceive of entertaining re-argument on [D]efendants' obligation to intiate its [pension] transfer obligations pursuant to 29 U.S.C. § 1415" and indicated that Defendants could only avoid a liability on Named Plaintiffs' claim for a transfer of welfare assets by identifying significant factual distinctions between this case and *Trapani*. (*Id.* at 7.) On April 19, 2013, the case was reassigned to the undersigned.

In accordance with Judge Ross's decision, the Local 1175 Pension Fund transferred the vested benefits of 17 former participants employed by College Point, Grace, and Willets Point, along with assets totaling $1,874,754, to the Local 175 Pension Fund in December 2013. (Pls.' Ex. K, Dkt. 287-12, at ECF 2–4.) In October 2014, the Local 1175 Pension Fund transferred an additional sum of $449,272.85, representing prejudgment interest to account for the delay in initiating the asset transfer. (Declaration of Jennifer Smith ("Smith Decl."), Dkt. 287-1, ¶16; Pls.' Ex. L, Dkt. 287-13, at ECF 2–3.) Named Plaintiffs challenged the calculation of the transferred assets and liabilities in a September 2015 partial summary judgment motion (Dkt. 191), resulting in the Court's September 2016 Order establishing the methodology for calculating the amount of

assets and interest to which the Local 175 Pension Fund was entitled (September 2016 Order by Judge Pamela K. Chen ("2016 Order"), Dkt. 231).

The parties subsequently engaged in discovery with respect to the Local 1175 Welfare Fund's contribution and asset history and prepared expert reports on damages. (Named Plaintiffs' Brief ("Pls.' Br."), Dkt. 287-21, at 8.) Named Plaintiffs served their initial expert report on March 6, 2017, and Defendants served their initial expert report on September 21, 2017. (Mehlsack Decl., Dkt. 290, ¶ 33.) Named Plaintiffs served an "Expert Rebuttal Report" on June 13, 2018, and filed the instant motion for class certification on August 13, 2018. (*Id.* ¶ 34; Dkt. 287.) Defendants objected to the inclusion of portions of Named Plaintiffs' two expert reports among the materials supporting the motion for class certification, arguing that their admissibility had not yet been tested. (Defendants' Brief ("Defs.' Br."), Dkt. 289, at 4–5.) As part of their reply on the motion for class certification, Named Plaintiffs included an affidavit by Charles Priolo, the Local 175 Funds' Business Manager and a previously undisclosed witness. (Affidavit of Charles Priolo, Dkt. 288-13.) Defendants filed a motion to strike Plaintiffs' expert reports and the Priolo affidavit on August 30, 2018. (Defendants' Motion to Strike ("Defs.' Mot. to Stike"), Dkt. 291.) Defendants subsequently served their expert rebuttal report on September 29, 2018. (Dkt. 298.)

### III. Class Certification Negotiations

The parties' most recent motions are the culmination of a process plagued by intransigence. Since at least June 30, 2017, the parties have engaged in voluminous correspondence and dialogue with each other and the Court regarding the propriety of class certification and the proper definition of the proposed subclasses. (*See, e.g.*, Dkts. 245, 246, 247, 248, 249, 254, 255, 256, 264, 265, 266, 267, 268, 272, 290-5, 290-6, 292.) The sheer bulk of this correspondence, and the extended time over which it has occurred, belies the reality that the parties, in fact, substantially agree on class

certification. Between January and May 2018, the Court held four conferences with the parties, at which it attempted to assist negotiations on class certification so that the parties might jointly propose definitions for the subclasses. (*See* Dkts. 290-5, 290-6, 292.) At those conferences, the parties explicitly agreed on a pension subclass definition and the basic principle of a welfare subclass. (Pls.' Br., Dkt. 287-21, at 16; Defs.' Br., Dkt. 289, at 1.) Despite both parties' desire to certify the subclasses and move forward with litigation on the merits, they were unable to arrive at a mutually agreeable definition of the welfare subclass. Faced with this disagreement, Named Plaintiffs declined to de-couple the certifications of the pension and welfare subclasses, so as to allow the agreed-upon pension subclass claims to move forward while the parties briefed their dispute as to the welfare subclass. (*See* May 4, 2018 Conference, Dkt. 290-5, at 56:18–23.) The parties now seek the Court's ruling on certification as to both subclasses so that the case may progress towards a final disposition.

In their motion for class certification, Named Plaintiffs propose the following subclass definitions:[3]

> Pension Subclass—All persons who were (i) employees of the employers College Point, Grace Industries and/or Willets Point, (ii) vested participants in the Local 1175 Pension Fund, and (iii) whose nonforfeitable benefits were transferred to the Local 175 Pension Fund in December 2013.

> Welfare Subclass—All persons who (i) had contributions made on their behalf to the Local 1175 Welfare Fund by one or more of College Point Asphalt, College Point Asphalt LLC, Queens County Manufacturing Group, Mt. Hope Trucking, Mt. Hope Rock Products, Mt. Hope Asphalt, Grace Associates (Recycle), Grace Industries (GR/ASP), Grace Industries, (Recycle), Grace Industries (A), Metropolitan Precast, Metropolitan Asphalt Corporation, Willets Point Asphalt Corporation, Willets Point Contracting Corporation, or Tully Construction Company, Inc. while members of Local 1175; (ii) were participants in the Local 1175 Welfare Fund in or before 2005, (iii) had contributions made on their behalf to the United Plant and Production Workers Local 175 Welfare Fund [*i.e.*, the Local

---

[3] The Court recapitulates Named Plaintiffs' proposed subclass definitions *verbatim*, despite some of the awkward, if not confusing, phrasing.

175 Welfare Fund], United Plant and Production Workers Local 175 Pension Fund [*i.e.*, the Local 175 Pension Fund], United Plant and Production Workers Local 175 Annuity Fund, and/or United Plant and Production Workers Local 175 Apprenticeship, Skill Improvement and Training Fund in or after 2005; and (iv) did not thereafter have any contributions made on their behalf to the Local 1175 Welfare Fund; (v) at or before the time of judgment as to the welfare subclass.

(Pls.' Br., Dkt. 287-21, at 16 (pension subclass); Named Plaintiffs' Reply ("Pls.' Reply"), Dkt. 288-14, at 13 (welfare subclass).)

Defendants consent to the pension subclass definition proposed by Named Plaintiffs. (Defs.' Br., Dkt. 289, at 1.) As to the welfare subclass, Defendants believe Named Plaintiffs' definition is fatally flawed as it would include persons without standing. (*Id*. at 18–22.) Thus, they propose a narrower definition:

Welfare Subclass—All employees of employers College Point Asphalt Corporation, Willets Point Contracting Corporation, and Grace Industries, LLC who were participants in the Local 1175 Welfare Fund and who became participants eligible for benefits from the Local 175 Welfare Fund as a result of a certified change in collective bargaining representative in 2005, excluding all persons who received retiree-related benefits from the Local 1175 Welfare Fund.

(*Id.* at 25.)

For the reasons that follow, the Court partially grants Named Plaintiffs' motion for class certification, certifying the pension subclass as defined by the parties on consent, but certifying a modified version of the welfare subclass proposed by Defendants.

## DISCUSSION

### I. Legal Standards

Federal Rule of Civil Procedure 23 allows a member of a class to sue on behalf of all members of that class provided that certain prerequisites are satisfied. Fed. R. Civ. P. 23. Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)). To ensure that a departure from the usual

rule is justified, the Court must conduct a "rigorous analysis" to ensure that the prerequisites of Rule 23 are actually met, not simply arguably supported. *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 33 (2d Cir. 2006) ("Actual, not presumed, conformance, with Rule 23[] remains . . . indispensable." (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982) (brackets omitted))).

Article III standing is a threshold precondition for a class action, as the Court's power to adjudicate the case depends on it. To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "'No class may be certified that contains members lacking Article III standing' and . . . any 'class must therefore be defined in such a way that anyone within it would have Article III standing.'" *In re LIBOR–Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 459 (S.D.N.Y. 2018) (brackets omitted) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)).

Provided Article III standing exists as to each potential class member, the Court must then analyze whether the proposed class definition satisfies the prerequisites of Federal Rule of Civil Procedure 23(a). Rule 23(a) "permits a case to be litigated as a class action only if (1) the class is so numerous that joinder of all members is impracticable [(numerosity)]; (2) there are questions of law or fact common to the class [(commonality)]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [(typicality)]; and (4) the representative parties will fairly and adequately protect the interests of the class [(adequacy of representation)]." *Johnson v. Nextel Commc'ns Inc*., 780 F.3d 128, 137 (2d Cir. 2015). The Second Circuit has also recognized that "Rule 23(a) contains an implied requirement of ascertainability." *B & R*

*Supermarket, Inc. v. MasterCard Int'l Inc.*, 17-CV-2738 (MKB), 2018 WL 1335355, at *11 (E.D.N.Y. Mar. 14, 2018) (citing *In re Petrobras Sec.*, 862 F.3d 250, 266 (2d Cir. 2017)). "To be ascertainable, the class must be readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling." *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) (internal quotation omitted).

Finally, after determining that Rule 23(a)'s requirements are met, the Court must find that the proposed class satisfies one of the bases for certification identified in Rule 23(b). *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). As relevant to this case, Rule 23(b) is satisfied if:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>>
>> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests; [or]
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.] . . .

Fed. R. Civ. P. 23(b)(1)–(2).

## II. Motion for Class Certification

Named Plaintiffs move to certify two subclasses in this action, a pension subclass and a welfare subclass. The Court has authority under Rule 23(c)(4) to divide a class into subclasses and treat each subclass as a separate class. Fed. R. Civ. P. 23(c)(4) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."). This authority

may be exercised "when it is the only way that a litigation retains its class character." *In Re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006) (internal quotation marks omitted). Because this action seeks to force the transfer of assets and liabilities between two different types of funds (*i.e.*, pension and welfare funds) based on duties imposed on Defendants by two different statutory provisions, the two transfers raise distinct issues. Accordingly, the Court finds that certification of two subclasses is appropriate in order to maintain the class character of this litigation.

As to the first subclass, Named Plaintiffs propose a pension subclass with claims under 29 U.S.C. § 1415 for the transfer of assets and liabilities from the Local 1175 Pension Fund to the Local 175 Pension Fund. Defendants consent to Named Plaintiffs' proposed definition of the pension subclass. As to the second subclass, the parties propose two competing definitions for a potential welfare subclass with claims under 29 U.S.C. § 1103 for the transfer of assets and liabilities form the Local 1175 Welfare Fund to the Local 175 Welfare Fund. The Court evaluates the proposed subclasses in turn.

### A.      Certification of the Pension Subclass

The parties jointly seek to certify the following pension subclass:

> All persons who were (i) employees of the employers College Point, Grace Industries and/or Willets Point, [and] (ii) vested participants in the Local 1175 Pension Fund, . . . (iii) whose nonforfeitable benefits were transferred to the Local 175 Pension Fund in December 2013.

(Pls.' Br., Dkt. 287-21, at 16.)

Based on the records before the Court, it appears that this subclass would include at least 17 individuals: 6 employees of College Point, 4 employees of Willets Point, and 7 employees of Grace. (Mehlsack Decl., Dkt. 290., ¶¶ 59–69; Defs.' Ex. 18, Dkt. 290-18.) For the reasons that follow, the Court certifies the jointly proposed pension subclass.

1.    <u>Standing</u>

As the Court previously stated in its September 2016 Order of partial summary judgment, standing under ERISA requires a plaintiff to establish "a constitutionally sufficient injury arising from the breach of a statutorily imposed duty," *i.e.*, Article III standing, and "identify a statutory endorsement of the action." *Hoeffner v. D'Amato*, No. 09-CV-3160 (PKC) (CLP), 2016 WL 8711082, at *14 (E.D.N.Y. Sept. 30, 2016) (quoting *Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 118 (2d Cir. 2009)); *see also Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (applying *Kendall* to determine standing in an ERISA action). In that Order, the Court determined that Named Plaintiffs' interest in ensuring that the Local 175 Pension Fund receives all the assets to which that fund is statutorily entitled is sufficient to support Article III standing. *Hoeffner*, 2016 WL 8711082, at *14. Furthermore, the Court determined that 29 U.S.C. 1451(a)(1) grants a cause of action to any "'plan participant . . . who is adversely affected by the act or omission of any party' . . . with respect to a multiemployer plan." *Id.* (quoting 28 U.S.C. 1451(a)(1). On this basis, the Court held that Named Plaintiffs had standing to pursue this action. *Id.* Because each potential pension subclass member shares the same alleged injury, *i.e.*, the Local 1175 Pension Fund's failure to initiate an allegedly mandatory asset transfer, and is entitled to redress the alleged injury through the same cause of action, § 1451(a)(1), the Court's holding applies to them with equal force. Thus, the Court finds that all potential members of the proposed pension subclass meet the standing requirement for class certification.

2.    <u>Rule 23(a)</u>

Having determined that all potential pension subclass members would have standing, the Court must next evaluate the proposed subclass for congruence with Rule 23(a).

a.    <u>Numerosity</u>

Rule 23(a)(1) provides: "One or more members of a class may sue or be sued as representative parties on behalf of all members only if . . . the class is so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1).  In the Second Circuit, "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  Nevertheless, there is "no magic minimum number" to establish numerosity. *Gortat v. Capala Bros.*, 949 F. Supp. 2d 374, 383 (E.D.N.Y. 2013), *aff'd sub nom.*, *Gortat v. Capala Bros., Inc.*, 568 F. App'x 78 (2d Cir. 2014) (quoting *Deen v. New Sch. Univ.*, No. 05-CV-7174, 2008 WL 331366, at *2 (S.D.N.Y. Feb. 4, 2008)).  "In dealing with the issue of numerosity, we deal with it not in absolute numbers, but in the relationship of the numbers of the putative class members involved to their economic interests and all of the other circumstances peculiar to each case." *Primavera Familienstiftung v. Askin*, 178 F.R.D. 405, 410 (S.D.N.Y. 1998) (brackets omitted) (quoting *Elliott Assoc. v. J. Henry Schroder Bank & Tr.*, 655 F. Supp. 1281, 1285 (S.D.N.Y. 1987)).  Moreover, "the Second Circuit has relaxed the numerosity requirement where," as here, "the putative class seeks injunctive and declaratory relief pursuant to Rule 23(b)(2)." *Nicholson v. Williams*, 205 F.R.D. 92, 98 (E.D.N.Y. 2001).  Thus, the numerosity requirement "is not strictly mathematical[,] but must take into account the context of the particular case." *Penn. Pub. Sch. Emps. Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014). Accordingly, when applying Rule 23(a)(1), the Court considers whether, in addition to the existence of a sufficiently large class, "a class [action] is superior to joinder based on other relevant factors." *Id*.

Considering both the size of the class and other relevant factors particular to this case, the Court finds that the proposed pension subclass satisfies Rule 23(a)(1).  If Named Plaintiffs prevail

in this action, the benefits will be shared by a larger group than just the class members themselves. The full membership of the Local 175 Pension Fund, as well as the designated beneficiaries of the unnamed subclass members, will benefit from a financially healthier fund following a transfer of assets to the Local 175 Pension Fund. Furthermore, joinder has proven impracticable. Because no individual class member will receive a cash payment in connection with this action and individual pension credits have already been transferred, the class members do not stand to directly benefit based on their active participation in the action. (Pls.' Br., Dkt. 287-21, at 19–20.) At the Court's direction, Named Plaintiffs' counsel tested the practicability of joinder by contacting all 13 putative class members who are not already serving as Named Plaintiffs, but none expressed interest in becoming personally involved in this litigation. (Declaration of David Eisenberg ("Eisenberg Decl."), Dkt. 287-19.)

Though it is not common, courts do certify classes of less than 20 members when joinder is nevertheless impracticable. *Grant v. Sullivan*, 131 F.R.D. 436, 446 (M.D. Pa. 1990) (noting that "[t]his Court may certify a class even if it is composed of as few as 14 members"); *Bruce v. Christian*, 113 F.R.D. 554, 557 (S.D.N.Y. 1986) (numerosity found even though the plaintiffs could identify only 16 class members, as numerous individuals would be affected in the future); *Brown v. City of Barre*, No. 5:10-CV-81, 2010 WL 5141783, at *4–*5 (D. Vt. Dec. 13, 2010) (approving a class where only two members were identified but a reasonable estimate of actual class members was 20); *see also Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 56 (N.D. Ill. 1996) ("A relatively small group may form a class if other considerations make joinder impracticable." (quotation omitted)). That is the case here. Because joinder is impracticable and the proposed pension subclass is sufficiently large to support numerosity, the Court finds Rule 23(a)(1)'s requirements are satisfied.

b. <u>Commonality</u>

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). For a question to be common, it must be "capable of class[-]wide resolution—which means that determinations of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The party seeking certification must demonstrate "the capacity of a class[-]wide proceeding to generate common answers apt to drive the resolution" of the case. *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–32 (2009)). "[E]ven a single common legal or factual question will suffice" to prove commonality. *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 289 (S.D.N.Y. 2015) (quoting *Freeland v. AT & T Corp.*, 238 F.R.D. 130, 140 (S.D.N.Y. 2006)).

The pension subclass proposed by the parties satisfies the Rule 23(a)(2) requirement of commonality. The same questions of law attach to each member of the proposed class: whether the decision to change their collective bargaining representative triggered a mandatory transfer of assets from the Local 1175 Pension Fund to the Local 175 Pension Fund and, if so, according to what formula. The best proof of this commonality can be found in the fact that, in December 2013, Defendants' acted uniformly with respect to the assets and liabilities of each putative class member, even though Judge Ross's 2012 summary judgment order was only binding as to the four Named Plaintiffs employed by College Point. (Pls.' Ex. K, Dkt. 287-12, at ECF 2–4; 2012 Order, Dkt. 72.) Thus, the Court finds that the pension subclass satisfies Rule 23(a)(2)'s commonality requirement.

c.    <u>Typicality</u>

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Shahriar v. Smith & Wollensky Rest. Grp., Inc*., 659 F.3d 234, 252 (2d Cir. 2011) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993). Typicality ensures that class representatives have the proper incentive to prove all elements of the cause of action that would be presented by individual members of the class if they were pursuing their own individualized actions. *Floyd v. City of New York*, 283 F.R.D. 153, 175 (S.D.N.Y. 2012) (citing *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 510 (S.D.N.Y. 1996).

The claims of Named Plaintiffs are typical of the claims of the proposed pension subclass members. Named Plaintiffs allege that they were harmed by precisely the same conduct, *i.e.*, Defendants' refusal to transfer pension fund assets and liabilities following a vote to change collective bargaining representatives, and seek the same remedy to that conduct under the same legal theories, *i.e.*, the transfer of those assets to the Local 175 Pension Fund pursuant to 29 U.S.C. § 1415. Furthermore, if the subclass's claims prevail, Named Plaintiffs will benefit in the exact same manner as the putative subclass members—a transfer will be made to the Local 175 Pension Fund, strengthening the financial health of the Fund. Thus, the Court finds Rule 23(a)(3) satisfied as to the proposed pension subclass.

d.    <u>Adequacy</u>

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The representative parties may be found

inadequate if there are conflicts of interest between the named plaintiffs and the class they seek to represent. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "Adequacy of representation is evaluated in two ways: (1) by looking to the qualifications of plaintiffs' counsel; and (2) by examining the interests of the named plaintiffs." *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 164 (S.D.N.Y. 2014) (quoting *Flores v. Anjost Corp.*, 284 F.R.D. 112, 128–29 (S.D.N.Y. 2012)). In examining the interests of named plaintiffs, courts consider whether they are prepared to fully litigate the action or have any known conflicts with other class members. *Shayler v. Midtown Investigations, Ltd.*, No. 12-CV-4685 (KBF), 2013 WL 772818, at *5 (S.D.N.Y. Feb. 27, 2013). A conflict of interest "must be fundamental" and concrete to defeat a motion for certification. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (citations omitted). In addition, class counsel must be "'qualified, experienced[,] and generally able' to conduct the litigation." *In re Drexel Burnham Lambert Grp. Inc.*, 960 F.2d 285, 291 (2d Cir. 1992) (quoting *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968)).

The Court finds Named Plaintiffs to be adequate class representatives. Named Plaintiffs have not demonstrated any unwillingness to vigorously pursue this action, despite its long-running nature. And there is no hint of conflict among Named Plaintiffs and the proposed pension subclass members in the record before the Court. To the contrary, the interests of Named Plaintiffs are substantively indistinguishable from any of the putative pension subclass members: their claims to relief will rise or fall together.

The Court also finds proposed class counsel to be adequate. Lead counsel Jennifer Smith is known to the Court as an experienced litigator in this area based on her representation in this case and in *Palumbo v. Fasulo*, No. 07-CV-797 (PKC) (RML). And though Defendants dispute the necessity of co-counsel for class representation, the law firm of New & Karfunkel originated

this action and have many years of experience litigating actions under ERISA. (Declaration of David W. New, Dkt. 287-17.) The Court expects class counsel will continue to coordinate their representation of the class so as to maximize efficiencies and avoid duplicative legal fees. (*See* Pls.' Reply, Dkt. 288-14, at 13–14.)

Accordingly, the Court finds representation of the proposed pension subclass to be adequate under Rule 23(a)(4).

e.    Ascertainability

Under the Second Circuit's implied ascertainability requirement, "a class is ascertainable if it is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d 250, 257 (2d Cir. 2017). The party seeking certification is not "require[ed to make] a showing of administrative feasibility at the class certification stage." *Id*. at 265.

The pension subclass proposed by the parties is ascertainable because its membership can be determined with reference to a single objective criterion: whether a person's nonforfeitable benefits were transferred from the Local 1175 Pension Fund to the Local 175 Pension Fund in December 2013. The class has already been, in effect, ascertained in light of the now-completed asset transfer by Defendants. (*See* Pls.' Ex. K, Dkt. 287-12, at ECF 2–4.)

\*      \*      \*

Accordingly, the Court finds that the pension subclass proposed by the parties satisfies all four requirements of Rule 23(a), as well as the additional implied requirement of ascertainability.

3.   Rule 23(b)

Having found that Rule 23(a)'s requirements are satisfied, the Court must now determine whether one of the bases for certification under Rule 23(b) exists.  In this case, Named Plaintiffs' seek certification pursuant to Rules 23(b)(1) and 23(b)(2).[4]

a.   Rule 23(b)(1)

Rule 23(b)(1) provides a basis for certification where the prosecution of separate actions by individual class members would create a risk of (A) inconsistent adjudications with respect to individual class members that would establish incompatible standards of conduct for a defendant, or (B) adjudications with respect to individual class members that would be dispositive of or detrimental to the interests of other members who are not parties to the individual adjudications. Fed. R. Civ. P. 23(b)(1)(A)–(B).

Adjudications of individual pension subclass members claims in this action would be dispositive of the interests of other non-party subclass members because Defendants are alleged to have breached a statutorily imposed fiduciary duty that requires them to treat the prospective members of the class uniformly.  *See Douglin v. GreatBanc Tr. Co.*, 115 F. Supp. 3d 404, 412 (S.D.N.Y. 2015) ("[A]ctions for breach of fiduciary duties are 'classic examples' of Rule 23(b)(1) cases, and courts in this Circuit have indeed determined that claims for breach of fiduciary duty brought under ERISA . . . are well suited to Rule 23(b)(1)." (internal citations omitted) (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 833–34 (1999))).  Indeed, "the structure of ERISA favors the principles enumerated under Rule 23(b)(1)(B)" because it creates "shared" rights among plan participants, meaning that adjudications of the rights of one participant may necessarily be dispositive of the interests of other participants.  *Id.*  Because of the inherently interrelated nature

---

[4] The Court notes that satisfaction of *either* Fed. R. Civ. P. 23(b)(1) or 23(b)(2) suffices.

of plan participants' rights, "most courts that have certified ERISA class actions alleging breaches of fiduciary duties have done so under Rule 23(b)(1)(B)." *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 165 (S.D.N.Y. 2017) (collecting cases). Because Defendants' alleged breach of a statutory duty is "the same as to all [putative class members,] resolution of one action against one [subclass member] would necessarily affect the resolution of any concurrent or future actions" by other subclass members. *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. 8:15-CV-1614, 2017 WL 2655678, at *8 (C.D. Cal. June 15, 2017). Accordingly, the Court finds that Rule 23(b)(1) provides a basis for certification of the proposed pension subclass.

### b. Rule 23(b)(2)

A class may be certified under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "A Rule 23(b)(2) class is appropriate only when 'a single injunction or declaratory judgment would provide relief to each member of the class.'" *Ault v. J.M. Smucker Co.*, 310 F.R.D. 59, 68 (S.D.N.Y. 2015) (quoting *Wal-Mart Stores*, 564 U.S. at 360). "It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Wal-Mart Stores*, 564 U.S. at 360.

This test is met here. The Local 1175 Pension Fund initially refused to transfer funds on grounds that apply generally to the entire proposed subclass. Final injunctive relief, in the form of an order to transfer the assets in a particular amount, would be appropriate to the class as a whole if Named Plaintiffs prevail. Accordingly, the Court finds that the proposed pension subclass also satisfies the requirements to certify a class under Rule 23(b)(2).

\*       \*       \*

Therefore, Named Plaintiffs' motion for class certification is granted as to the parties' jointly proposed pension subclass.

**B.    Certification of the Welfare Subclass**

Named Plaintiffs also seek to certify a welfare subclass as to their claims for a transfer of assets and liabilities from the Local 1175 Welfare Fund to the Local 175 Welfare Fund, but the parties dispute the proper definition of this subclass. For the reasons stated below, the Court finds both proposed definitions deficient, and certifies a modified version of Defendants' proposed welfare subclass definition.

### 1.    Named Plaintiffs' Proposed Welfare Subclass Definition

Named Plaintiffs propose that a welfare subclass be defined and certified as follows:

> All persons who (i) had contributions made on their behalf to the Local 1175 Welfare Fund by one or more of College Point Asphalt, College Point Asphalt LLC, Queens County Manufacturing Group, Mt. Hope Trucking, Mt. Hope Rock Products, Mt. Hope Asphalt, Grace Associates (Recycle), Grace Industries (GR/ASP), Grace Industries, (Recycle), Grace Industries (A), Metropolitan Precast, Metropolitan Asphalt Corporation, Willets Point Asphalt Corporation, Willets Point Contracting Corporation, or Tully Construction Company, Inc. while members of Local 1175; (ii) were participants in the Local 1175 Welfare Fund in or before 2005, (iii) had contributions made on their behalf to the United Plant and Production Workers Local 175 Welfare Fund, United Plant and Production Workers Local 175 Pension Fund, United Plant and Production Workers Local 175 Annuity Fund, and/or United Plant and Production Workers Local 175 Apprenticeship, Skill Improvement and Training Fund in or after 2005; and (iv) did not thereafter have any contributions made on their behalf to the Local 1175 Welfare Fund; (v) at or before the time of judgment as to the welfare subclass.

(Pls.' Reply, Dkt. 288-14, at 13.)

The Court finds that this subclass definition is deficient because it would include individuals who left employment with one of the exiting employers or their predecessors prior to August 2005—meaning that they ceased to be participants in the Local 1175 Welfare Fund before any vote to change bargaining representatives—and, by sheer coincidence, were later employed by a *different* employer affiliated with the Local 175 Welfare Fund (to borrow Defendants' term,

a "wandering employee"). Wandering employees who are still with a Local 175-affiliated employer have an interest in seeing the transfer of assets to the Local 175 Welfare Fund, as they would benefit from a healthier Fund, but they have no cause of action to enforce the transfer.[5]

Wandering employees have no cause of action because Defendants would not have owed any fiduciary obligation to such an employee at the time of College Point, Willets Point, or Grace's departure from the Local 1175 Welfare Fund. Rather, Defendants' alleged obligation under 29 U.S.C. § 1103(c)(1), as interpreted by the Second Circuit in *Trapani v. Consolidated Edison Employees' Mutual Aid Society*, 891 F.2d 48 (2d Cir. 1989), is to transfer an aliquot share of assets to the successor fund when all employees of a given employer change funds, not when an individual employee leaves the employer and ends up working for an employer with a different

---

[5] However, individuals like former Willets Point employee Michael LoCicero—who, for a time, might have been considered a wandering employee (Mehlsack Decl., Dkt. 290, ¶ 70; Defs.' Ex. 19, Dkt. 290-19; Defs.' Ex. 20, Dkt. 290-20), but who has since moved to an employer unaffiliated with the Local 175 Welfare Fund—do not have a *present* interest in the transfer of assets to that fund. *Cf. Dickerson v. Feldman*, 426 F. Supp. 2d 130, 135 (S.D.N.Y. 2006) ("As a former [plan] participant, [the plaintiff] is unable to demonstrate that he has an injury that is redressable by this Court because he fails to show either 'a reasonable expectation of returning to covered employment or . . . a colorable claim to vested benefits.'" (quoting *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 117 (1989))).

The Court notes that this issue provides another reason for rejecting Named Plaintiffs' proposed welfare subclass definition, which would include subclass members like Mr. LoCicero who lack standing in this case. Contrary to Plaintiffs' argument that former Local 175 members need not be current members in order to sue (Pls.' Reply, Dkt. 288-14, at 7), as discussed above, redressability is an irreducible constitutional requirement for Article III standing. *Accord Dickerson*, 426 F.3d at 135.

However, to be clear, excluding employees who are no longer members of the Local 175 Welfare Fund from the welfare subclass does not foreclose damages based on welfare fund contributions that were made by the employer to the Local 1175 Welfare Fund for all of its transferring employees, including any now-former Local 175 Welfare Fund members, prior to the 2005 change in collective bargaining representatives. Defendants appear to concede this. (Defs.' Br., Dkt. 289, at 13–14 (arguing that damages should be *limited* to contributions made on behalf of employees who transferred funds due to the election, making no distinction as to transferring employees who may have since departed the Local 175 Welfare Fund).)

bargaining representative. At the time of the mass departure of the employees of College Point, Willets Point, and Grace, any wandering employees were not entitled to receive the benefit of past contributions made by those employers to the Local 1175 Welfare Fund on the wandering employees' behalf. Thus, these employees do not fall within the "zone of interests" protected by § 1103. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (requiring a plaintiff's claim to "fall within the zone of interests protected by the law invoked"). And because wandering employees are outside of the zone of interests of that provision, they have no cause of action. *See Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 (2014) (characterizing the "zone of interests" test as asking "whether 'this particular class of persons ha[s] a right to sue under this substantive statute'" (quoting *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 675–676 (2013) (Silberman, J., concurring))).

Without a cause of action against Defendants for violating § 1103, the wandering employees lack standing under ERISA, *see Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (requiring a statutory cause of action to exist to establish standing under ERISA), and therefore may not participate as members of a subclass in this action to enforce any alleged obligation that Defendants have to transfer assets attributable to those contributions.

Accordingly, the Court declines to certify Named Plaintiffs' proposed welfare subclass.

2.    Defendants' Proposed Subclass Definition

Defendants propose that the welfare subclass be defined and certified as follows:

> All employees of employers College Point Asphalt Corporation, Willets Point Contracting Corporation, and Grace Industries, LLC who were participants in the Local 1175 Welfare Fund and who became participants eligible for benefits from the Local 175 Welfare Fund as a result of a certified change in collective bargaining representative in 2005, excluding all persons who received retiree-related benefits from the Local 1175 Welfare Fund.

(Defs.' Br., Dkt. 289, at 25 (emphasis added).)

The Court also finds Defendants' proposed subclass definition to be deficient. The final element of Defendants' proposed definition, excluding all persons who had ever received retiree-related benefits[6] from the Local 1175 Welfare Fund, is unduly restrictive. Like many welfare benefits funds, both the Local 1175 Welfare Fund and the Local 175 Welfare Fund make certain benefits available to retired participants. (*See* Local 1175 Welfare Fund 2006 Summary Plan, Dkt. 290-9, at 98–99; 2005 Local 175 Welfare Fund Paving Division Summary Plan ("Local 175 Paving Plan"), Dkt 290-21, at ECF 7–9.) Retirement benefits may include any of the benefits offered to actively employed participants, such as life insurance, death benefits, and health insurance. (*See, e.g.*, Local 175 Paving Plan, Dkt. 290-21, at ECF 34 (making a $30,000 death benefit available to a retiree's beneficiary).) The scope of retiree coverage offered by a welfare fund is at the fund's discretion, though that discretion may be constrained by a collective bargaining agreement. *See M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933, 937 (2015) (finding that a collective bargaining agreement's terms governed the question of whether a welfare fund's retirees were entitled to receive lifetime health care benefits).

---

[6] According to the parties, this situation applies to at least two individuals, Thomas Mangone and Anthony Ferrari, former Grace employees who transferred from the Local 1175 Welfare Fund to the Local 175 Welfare Fund, but temporarily received retiree benefits from the Local 1175 Welfare Fund. (Mehlsack Decl., Dkt. 290, ¶ 71; Defs.' Ex. 18, Dkt. 290-18, at 2; Pls.' Br., Dkt. 287-21, at 14 n.11.) Mangone and Ferrari retired after becoming participants in the Local 175 Welfare Fund. (Defs.' Ex. 18, Dkt. 290-18, at 2.) Despite being participants in the Local 175 Welfare Fund, they became eligible upon retirement to receive retiree benefits from the Local 1175 Welfare Fund because their pension assets had not yet been transferred—though they should have been by then—to the Local 175 Pension Fund. (*See* Defs.' Ex. 9, Dkt. 290-9, at 98–99 (indicating that eligibility for retiree benefits from the Local 1175 Welfare Fund in October 2006 was based, *inter alia*, on the retiree's pension credits); Pls.' Br., Dkt 287-21, at 14 n.11.) Mangone and Ferrari ceased to receive retiree benefits from the Local 1175 Welfare Fund by December 2008 (Defs.' Ex. 18, Dkt. 290-18, at 2), and their pension assets were transferred as part of the December 2013 asset transfer from the Local 1175 Pension Fund to the Local 175 Pension Fund (Pls.' Ex. I, Dkt. 287-10, at ECF 3).

While Defendants are correct that a putative class member who *currently* receives retiree benefits from the Local 1175 Welfare Fund, or will become eligible to receive those benefits from the Local 1175 Welfare Fund in the future, should be excluded from the welfare subclass, putative subclass members who may have received retiree benefits from the Local 1175 Welfare Fund in the past, but are ineligible to receive them now or in the future (from the Local 1175 Welfare Fund), should not be excluded. A putative subclass member who currently receives, or will become eligible to receive, *any* benefits from the Local 1175 Welfare Fund has an interest in that fund *and* in the Local 175 Welfare Fund. In other words, this subset of employees has an interest both in keeping assets with the Local 1175 Welfare Fund and in transferring assets to the Local 175 Welfare Fund; their interests straddle the two funds. This divided loyalty raises a conflict of interest that would undermine the welfare subclass to be certified in this case. Accordingly, putative subclass members who meet this description should be excluded from the welfare subclass. However, the Court can discern no legitimate reason to exclude putative subclass members based solely on their receipt of retirement-related welfare benefits *at any point in the past*, a stale conflict that has no relevance to the instant action.

Additionally, if Defendants' proposed welfare subclass definition were read literally, it would even exclude putative subclass members who have only ever been eligible to receive retiree-related benefits from the Local 175 Welfare Fund. The use of the term "employees" in Defendants' proposed welfare subclass definition would exclude individuals who were employed by the exiting employers as of August 2005, who became eligible for benefits (including retiree-related benefits) from the Local 175 Welfare Fund because of the fund switch in 2005, but have since retired (*i.e.*, are no longer "employees" of College Point, Willets Point or Grace), even though those former employees remain eligible to receive benefits from the Local 175 Welfare Fund. Though neither

party discusses this ambiguity in their briefing, the Court *sua sponte* eliminates it through its modification of Defendants' proposed welfare subclass definition.

### 3. Modified Subclass Definition

Under Rule 23(c), the Court has the discretion to alter a party's proposed class definition. Fed. R. Civ. P. 23(c)(1)(c); *see also Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 n.9 (2d Cir. 2007) (stating that a district court "can always alter" a certified class). The Court exercises its discretion to amend the unduly restrictive element of Defendants' proposed welfare subclass definition. As modified, the welfare subclass that the Court considers for purposes of class certification is defined as follows:

> All employees <u>and former employees</u> of employers College Point Asphalt Corporation, Willets Point Contracting Corporation, and Grace Industries, LLC who were participants in the Local 1175 Welfare Fund and who became participants eligible for benefits in the Local 175 Welfare Fund as a result of a certified change in collective bargaining representative in 2005, <u>excluding all persons who currently receive or become eligible to receive benefits from the Local 1175 Welfare Fund</u>.[7]

Based on the records before it, the Court finds that at least 21 individuals meet this definition and, thus, would become members of the subclass: 7 employees of College Point, 6

---

[7] Though not an exhaustive explanation, the Court notes that the phrase "become eligible to receive benefits from the Local 1175 Welfare Fund" is intended to cover, *inter alia*, current Local 175 Welfare Fund participants who transferred from the Local 1175 Welfare Fund because of the 2005 elections, yet who leave their employers during the pendency of this case and join an employer affiliated with the Local 1175 Welfare Fund, thus "becom[ing] eligible to receive benefits from the Local 1175 Welfare Fund." The Court has excluded these employees from the welfare subclass because they lack standing to enforce the claims in this case. However, and as previously stated, their exclusion from the class does not limit or alter the damages that may be awarded, which will be determined based on the welfare fund contributions that had been made at the time of the 2005 transfers by the employers on behalf of *all* of their employees, regardless of whether those employees are members of the welfare subclass certified in this case. *Trapani v. Cons. Edison Emps. Mut. Aid Soc.*, Inc., 891 F.3d 48, 50 (2d Cir. 1989) (stating that a "successor fund [is] entitled to the aliquot share of the assets" so that the employers workers may derive the benefit).

employees of Willets Point, and 8 employees of Grace. (Mehlsack Decl., Dkt. 290 ¶¶ 59–69; Defs.' Ex. 18, Dkt. 290-18, at 2.) For the reasons that follow, the Court finds that this subclass meets the requirements for certification under Rule 23.

### a. Standing

As stated above, all members of a proposed subclass must have standing. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006). Thus, each prospective subclass member must have "a constitutionally sufficient injury arising from the breach of a statutorily imposed duty" and "identify a statutory endorsement of the action." *Hoeffner v. D'Amato*, 2016 WL 8711082, at *14. Named Plaintiffs' and all putative members of the welfare subclass share an interest in the financial health of the Local 175 Welfare Fund. This interest means that they are harmed by any failure to transfer assets to which that fund is entitled, just as participants in the Local 175 Pension Fund are harmed by the failure to transfer assets to that fund. *Id.* Thus, each member of the welfare subclass, as modified by the Court, satisfies Article III's standing requirement. Furthermore, ERISA provides a cause of action to each member of the subclass in 29 U.S.C. § 1132, which allows a cause of action for equitable relief to redress violations of a fiduciary duty. This suffices to establish that all potential members of the welfare subclass meet the standing requirement for class certification.

### b. Rule 23(a)

### i. Numerosity

Considering the size of the subclass and other relevant factors, the Court finds that the welfare subclass satisfies Rule 23(a)(1)'s numerosity requirement. First, the Court notes that the welfare subclass is within the "gray area," *i.e.*, between 21 and 40 class members, where courts often find that a proposed class satisfies numerosity. *Ansari v. NYU*, 179 F.R.D. 112, 114

(S.D.N.Y. 1998). Furthermore, the same factors supporting certification of the pension subclass exist with respect to the welfare subclass. All participants in the Local 175 Welfare Fund stand to benefit from a transfer of assets from the Local 1175 Welfare Fund, but no individual subclass members will receive a direct gain based on active participation in the action. This lack of incentive for individual actions makes joinder impracticable, as demonstrated by Named Plaintiffs' counsel's efforts to test the interest of putative class members in direct involvement. (Eisenberg Decl., Dkt. 287-19.) In light of the impracticability of joinder, the welfare subclass satisfies Rule 23(a)(1).

### ii.   Commonality

The welfare subclass, as modified by the Court, satisfies Rule 23(a)(2)'s commonality requirement. As with the pension subclass, the same questions of law attach to each member of the proposed class: whether the exit of all employees of an employer from the Local 1175 Welfare Fund triggers a mandatory transfer of assets to the successor fund, the Local 175 Welfare Fund. Because "even a single common legal or factual question will suffice" to prove commonality, *Ruiz*, 93 F. Supp. 3d at 289, the Court finds that the welfare subclass passes muster under Rule 23(a)(2).

### iii.   Typicality

The Court also finds that the Named Plaintiffs' claims are typical of the claims of the welfare subclass members. Named Plaintiffs allege that they were harmed by precisely the same conduct—Defendants' refusal to transfer welfare fund assets and liabilities following a mass exit of all of an employer's employees from the Local 1175 Welfare Fund—and seek the same remedy to that conduct under the same legal theories—the transfer of those assets to the Local 175 Welfare Fund pursuant to 29 U.S.C. § 1103(c)(1). Furthermore, if the welfare subclass claims prevail, Named Plaintiffs will benefit in the exact same manner as the putative subclass members: a transfer

will be made to the Local 175 Welfare Fund, strengthening the financial health of that fund. Accordingly, the welfare subclass satisfies Rule 23(a)(3).

### iv.   Adequacy

As stated in the Court's analysis with respect to the adequacy of the class representatives for the pension subclass, there is no suggestion in the record that Named Plaintiffs have a fundamental conflict of interest with the welfare subclass in general or any individual subclass members in particular. And the Court finds that proposed class counsel are qualified and able to adequately litigate this action. Accordingly, the Court finds representation of the proposed welfare subclass to be adequate under Rule 23(a)(4).

### v.   Ascertainability

The Court further finds that the welfare subclass satisfies the implied requirement of ascertainability. The subclass membership is defined with sufficient clarity that it is administratively feasible for the Court to determine who is a member of the class and who is not. At the time of judgment, the Court will be able to readily identify which of the closed set of employees of College Point, Willets Point, and Grace who transferred from the Local 1175 Welfare Fund to the Local 175 Welfare Fund following the change of collective bargaining representative (1) became eligible for benefits from the Local 175 Welfare Fund, and (2) have no current interest in the Local 1175 Welfare Fund. Accordingly, the Court will be able to determine "who will be bound by the judgment." *Brecher v. Rep. of Arg.*, 806 F.3d 22, 25 (2d Cir. 2015). Thus, the welfare subclass meets the implied requirement of ascertainability.

### c.   Rule 23(b)

Because the welfare subclass satisfies Rule 23(a)'s requirements, the Court must also determine whether one of the bases for certification under Rule 23(b) are present. Though the

welfare subclass members belong to three different employers, Defendants are alleged to have breached the same duty as to all members of the subclass. Thus, any resolution of this allegation will necessarily be dispositive of the interests of non-party subclass members. Furthermore, the Local 1175 Welfare Fund has refused to transfer assets and liabilities to the Local 175 Welfare Fund on the grounds that it has no duty to initiate such a transfer. Thus, it has refused to act on grounds that apply to the entire welfare subclass. This renders injunctive relief appropriate as to the entire welfare subclass if Named Plaintiffs prevail on the merits in this case. Accordingly, the Court finds that the proposed welfare subclass may be certified pursuant to Rule 23(b)(1) and Rule 23(b)(2).

*     *     *

In sum, finding all of the requirements of Rule 23(a)(1) and 23(b)(1) and (2) met, the Court grants Named Plaintiffs' motion for class certification of a welfare subclass, but as defined by the Court herein.

## III.    Motion to Strike

Finally, Defendants have moved to strike the expert report excerpts and the Priolo affidavit submitted by Named Plaintiffs in nominal support of their motion for class certification. (Defs.' Mot. to Strike, Dkt. 291.) Named Plaintiffs characterize these submissions as providing "background" information (Named Plaintiff's Response, Dkt. 294), though Defendants argue that they contain information that would be necessary to establish Article III standing on behalf of some members of Named Plaintiffs' proposed welfare class (Defs.' Mot. to Strike, Dkt. 291, at ECF 1–2). Because the Court rejects Named Plaintiffs' proposed welfare subclass on statutory grounds, rather than constitutional grounds, it has no occasion to consider the content of Named

Plaintiffs' submissions. Accordingly, the Court finds Defendants' motion to strike is moot.[8]

*Accord Parsons v. Ryan*, No. CV–12–00601–PHX–NVW, 2014 WL 3887867, at *3 n.2 (D. Ariz. Aug. 7, 2014) (denying motion to strike as moot where a party's submission was not considered); *Bateman Harden PA v. Francis*, No. 4:10-CV-136–MCR/CAS, 2012 WL 3689402, at *2 (N.D. Fla. Aug. 27, 2012) (finding a motion to strike as moot where the court had no occasion to consider the exhibits attached to a party's filing).

## CONCLUSION

For the reasons stated herein, the Court certifies the following subclasses in this action:

Pension Subclass—All persons who were (i) employees of the employers College Point, Grace Industries and/or Willets Point, (ii) vested participants in the Local 1175 Pension Fund, and (iii) whose nonforfeitable benefits were transferred to the Local 175 Pension Fund in December 2013.

Welfare Subclass—All employees and former employees of employers College Point Asphalt Corporation, Willets Point Contracting Corporation, and Grace Industries, LLC who were participants in the Local 1175 Welfare Fund and who became participants eligible for benefits in the Local 175 Welfare Fund as a result of a certified change in collective bargaining representative in 2005, excluding all persons who currently receive or become eligible to receive benefits from the Local 1175 Welfare Fund.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 29, 2019
Brooklyn, New York

---

[8] The Court notes, however, that Named Plaintiffs' submission of portions of its expert's reports in support of their certification motion was improper, given that the admissibility of either party's expert testimony had not yet been established for class certification purposes and expert discovery had not yet closed.