UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
RALPH HOEFFNER, ANTHONY LONGO,
ANTHONY TOMASZEWSKI and
KENNETH REESE, as participants and/or
former participants of the SAND, GRAVEL,                          **MEMORANDUM & ORDER**
CRUSHED STONE, ASHES and                                          09-CV-3160 (PKC) (CLP)
MATERIAL YARD WORKERS LOCAL
UNION NO. 1175 LIUNA PENSION FUND
and WELFARE FUND, on behalf of
themselves and all persons similarly situated,

                            Plaintiffs,

                   - against -

JOE D'AMATO, FRANK OMBRES,
ALEXANDER MIUCCIO, FRANK P.
DIMENNA and JOHN DOES 1 - 4, in
their capacity as Trustees of the SAND,
GRAVEL, CRUSHED STONE, ASHES and
MATERIAL YARD WORKERS LOCAL
UNION NO. 1175 LIUNA PENSION FUND
and WELFARE FUND,

                            Defendants.
--------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

        In August 2005, Ralph Hoeffner, Anthony Longo, Anthony Tomaszweski, and Kenneth

Resse (collectively "Named Plaintiffs") were among a group of unionized asphalt plant workers

who voted to change their collective bargaining representatives from the Sand, Gravel, Crushed

Stone, Ashes and Material Yard Workers Local Union No. 1175 ("Local 1175") to the United

Plant & Production Workers Local No. 175 ("Local 175").  Upon joining Local 175, Named

Plaintiffs also switched to the pension and welfare plans associated with their new union.  Since

2009, Named Plaintiffs have been engaged in this lawsuit with Defendants who are the trustees of

Local 1175's pension and welfare funds over whether those funds were obligated to transfer a

share of the assets to the new plans, and if so, how to accurately calculate the amount that should be transferred.

Presently before the Court is Defendants' motion to dismiss the remaining claims for lack of Article III standing in light of the Supreme Court's decision in *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615 (2020).  (Dkt. 329.)  For the reasons explained below, Defendants' motion to dismiss is denied.

## BACKGROUND

The parties' familiarity with the facts of this case is presumed, and the Court summarizes here only those facts relevant to the instant motion.

## I.    Factual Background

In August 2005, Named Plaintiffs and other unionized asphalt plant workers voted to switch their collective bargaining representative from Local 1175 to Local 175.  (Amended Complaint ("Am. Compl."), Dkt. 53, ¶¶ 8–11, 32; January 19, 2012 Order ("2012 Order") by Judge Allyne R. Ross, Dkt. 72, at 2–3.)  After this change in union representatives, the employers of these unionized workers stopped contributing to the pension and welfare funds associated with Local 1175 (collectively, "the Local 1175 Funds", and respectively "the Local 1175 Pension Fund" and "the Local 1175 Welfare Fund").  (Am. Compl., Dkt. 53, ¶ 32; 2012 Order, Dkt. 72, at 3.) Employer contributions for Named Plaintiffs and others who switched to Local 175 were thereafter directed to the pension and welfare funds associated with that union (collectively, "the Local 175 Funds", and respectively "the Local 175 Pension Fund" and "the Local 175 Welfare Fund").  (Am. Compl., Dkt. 53, ¶ 32; 2012 Order, Dkt. 72, at 3.)

In November 2007, Named Plaintiffs and other plan participants who switched their pension and benefit plans to the Local 175 Funds requested a transfer of "their aliquot share of assets" from the Local 1175 Funds to the Local 175 Funds.  (2012 Order, Dkt. 72, at 3; September

30, 2016 Order ("2016 Order"), Dkt. 231, at 2; March 29, 2019 Order ("2019 Order"), Dkt. 299,

at 2–3.)  In April 2008, this group again requested the asset transfer, which Defendants rejected.

(2012 Order, Dkt. 72, at 3–4; 2016 Order, Dkt. 231, at 2–3; 2019 Order, Dkt. 299, at 3;  Named

Plaintiffs' Exhibit K, Dkt. 67-3, at ECF[1] 42–44.)

## II.    Procedural History

Named Plaintiffs filed this putative class action on July 22, 2009, alleging that Defendants

were required under the Employee Retirement Income Security Act of 1974 ("ERISA") to transfer

the aliquot share of assets attributable to contributions made on behalf of the putative class

members by their employers to the respective Local 175 Funds.  (*See generally* Dkt. 1.)  On March

21, 2011, Named Plaintiffs amended their complaint to add additional claims and to propose

separate subclasses for the claims related to the Local 175 Pension Fund and the Local 175 Welfare

Fund.  (Am. Compl., Dkt. 53, ¶¶ 24–29.)

On January 13, 2012, the Honorable Allyne R. Ross, who at the time presided over this

case, issued an order resolving motions for summary judgment from Defendants and Named

Plaintiffs.[2]  In her order, Judge Ross held, in relevant part, that (1) 29 U.S.C. § 1415 mandates a

transfer of liabilities and assets from the Local 1175 Pension Fund to the Local 175 Pension Fund,[3]

and (2) Defendants were required to transfer Named Plaintiffs' aliquot share of assets from the

Local 1175 Welfare Fund to the Local 175 Welfare Fund pursuant to the Second Circuit's

---

[1] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system, not the document's internal pagination.

[2] Defendants sought summary judgment in their favor on all of the claims, while Named Plaintiffs moved for summary judgment directing Defendants to initiate the process of transferring pension funds pursuant to 29 U.S.C. § 1415 and transferring aliquot share of welfare fund assets pursuant to 29 U.S.C. § 1103.  (*See* 2012 Order, Dkt. 72, at 4.)

[3] The Court refers to ERISA sections by their numbering under Title 29 of the U.S. Code.

interpretation of 29 U.S.C. § 1103(c)(1) in *Trapani v. Consolidated Edison Emps.' Mut. Aid Soc.*, 891 F.2d 48 (2d Cir. 1989), assuming that it could be determined at a later date whether any "assets [are] attributable to the departing employees." (2012 Order, Dkt. 72, at 10–11, 15–16.) After Defendants obtained new counsel and requested a pre-motion conference to file a motion for reconsideration of the 2012 Order (*see* Dkt. 82), Judge Ross withdrew that order, deciding that the parties' motions for summary judgment were premature, and ordered the parties to proceed to discovery (*see* Dkt. 90). In explaining her decision to withdraw the 2012 Order, Judge Ross explicitly affirmed her reasoning with respect to Plaintiffs' welfare class claims, noting that Defendants likely would be able to avoid liability on those claims only if they can identify significant factual distinctions between this case and *Trapani*. (*See* Dkt. 90, at 7.)

In December 2013, the Local 1175 Pension Fund transferred $1,874,754 of assets to the Local 175 Pension Fund, and followed up in October 2014 with a transfer of $449,273, "representing prejudgment interest to account for the delay in initiating the asset transfer." (2019 Order, Dkt. 299, at 4; Named Plaintiffs' Exhibit K, Dkt. 287-12, at ECF 2–4; Named Plaintiffs' Exhibit L, Dkt. 287-13, at ECF 2–3.) The parties disagreed, however, on how to properly calculate the amount of pension fund assets that Defendants had to transfer, including whether and how much additional prejudgment interest was owed with respect to those assets. (*See* Dkt. 191-24.) Following another round of summary judgment briefing over that question, this Court issued an order on September 30, 2016, holding that Named Plaintiffs had Article III standing to dispute the calculation of the transferred pension fund assets.[4] (2016 Order, Dkt. 231, at 26–28.) On the merits, the Court held, *inter alia,* that Named Plaintiffs were entitled to prejudgment interest that fairly represents the Local 175 Pension Fund's normal return on investment, but that there was a

---

[4] On April 19, 2013, the case was reassigned to the undersigned.

question of fact as to whether the Local 175 Pension Fund's investment strategy (and thus its normal return of investment) would have been higher if it had received the asset transfer when it was supposed to have received it.  (*Id.* at 26.)

Following the Court's 2016 Order, the parties continued to negotiate over the correct prejudgment interest rate for the pension fund.  (*See* Dkts. 245–254.)  On a parallel track, Named Plaintiffs moved for class certification.  (*See* Dkts. 255–256, 287–291, 294.)  On March 29, 2019, this Court issued an order certifying separate subclasses for the pension claims and the welfare claims.  (2019 Order, Dkt. 299, at 30.)  The litigation then experienced several unexpected delays due to the COVID-19 pandemic, and serious and even fatal illness befalling expert witnesses and defense counsel.  (*See* Dkts. 302, 307, 309, 311.)  As of March 2021, the parties reported that they were engaged in mediation on the remaining prejudgment interest issue for the pension claims, while continuing with discovery on the welfare claims.  (*See* Dkt. 316.)

On June 15, 2021, Defendants filed a pre-motion conference letter seeking to dismiss the remaining claims in this case, relying in large part on the Supreme Court's holding in *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615 (2020).  (Dkt. 317.)  On July 7, 2021, Named Plaintiffs responded in opposition to the anticipated motion to dismiss, (Dkt. 319), and the Court held a pre-motion conference on August 19, 2021 (*see* 8/19/2021 Minute Entry).   Briefing in connection with Defendants' motion to dismiss was completed on December 21, 2021.  (*See* Dkts. 329–334.)  On April 28, 2022, the Court extended a stay on expert discovery that had been issued on August 19, 2021.  (*See* 4/28/2022 Docket Order.)

For the reasons that follow, the Court denies Defendants' motion to dismiss and lifts the stay on expert discovery.

## DISCUSSION

### I.    Legal Standard

#### A.    12(b)(1) Motion to Dismiss

Defendants bring this motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"), for lack of subject matter jurisdiction.  A claim is "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

A defendant's Rule 12(b)(1) motion "may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both."  *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001).  If the defendant's motion "challenges only the legal sufficiency of the plaintiff's jurisdictional allegations[,] . . . the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff."  *Id.* (internal quotation marks and citations omitted); *see also Carter v. Healthport Tech., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) ("When the Rule 12(b)(1) motion is facial, *i.e.,* based solely on the allegations of the complaint or the complaint and exhibits attached to it . . . the plaintiff has no evidentiary burden.").  By contrast, if "jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits."  *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)).  In such a case, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that [subject matter jurisdiction] exists.'"  *Id.* (quoting *Makarova*, 201 F.3d at 113).  In ruling on a 12(b)(1) challenge, the district court must make "findings of fact in aid of its decision as to standing," if any "extrinsic evidence presented by the defendant is material and controverted."  *See Carter*, 822 F.3d at 57.

6

B.      **Jurisdiction and Article III Standing**

Article III of the Constitution "confines the federal judicial power to . . . 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC*, 433 F.3d 181, 198 (2d Cir. 2005).

To establish Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–61 (1992)). "The party invoking federal jurisdiction bears the burden of establishing" each element of standing, which "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at successive stages of litigation." *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 300 (2d Cir. 2021) (quoting *Lujan*, 504 U.S. at 561). "[H]ere, at the motion-to-dismiss stage, 'general factual allegations of injury resulting from the defendant[s'] conduct may suffice.'" *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 253 n.13 (E.D.N.Y. 2021) (quoting *Lujan*, 504 U.S. at 561).

"To demonstrate injury in fact, a plaintiff must show the invasion of a [1] legally protected interest that is [2] concrete and [3] particularized and [4] actual or imminent, not conjectural or hypothetical." *Strubel v. Comenity Bank*, 842 F.3d 181, 188 (2d Cir. 2016) (internal quotation marks and citations omitted). Physical or monetary injury to the plaintiff is a concrete injury in fact under Article III. *See TransUnion*, 141 S. Ct. at 2204. Where a plaintiff lacks an injury-in-

fact, the plaintiff lacks standing, and federal courts lack jurisdiction to entertain their claims. *Id.* at 2205.

To satisfy the fairly traceable requirement of Article III, a plaintiff must "demonstrate a causal nexus between the defendant's conduct and the injury." *See Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quotation omitted). Although it is more difficult to show this causal nexus for an indirect injury, indirectness of an injury is "'not necessarily fatal to standing' because the 'fairly traceable' standard is lower than that of proximate cause." *Id.* (internal citations omitted). As compared to the standard for the merits stage, the pleading standard "for Article III standing is not whether the alleged injury is *plausibly* fairly traceable, but, rather whether the injury is *possibly* fairly traceable." *Dennis v. JP Morgan Chase & Co.*, 343 F. Supp. 3d 122, 156 (S.D.N.Y. 2018).

Finally, Article III requires that plaintiffs demonstrate "the likelihood that the relief requested, would in principle, redress the alleged injury." *Heldman on Behalf of T.H. v. Sobol*, 962 F.2d 148, 157 (2d Cir. 1992). To answer the question of whether the relief sought by the plaintiff would redress the purported injury, courts "must examine whether this injury is redressable even though the nexus between the judicial relief and the injury is mediated by a third party." *Id.* "As with the causation requirement, indirectness of redressability is not dispositive, if the plaintiff alleges the links in the chain of redressability." *Id.*

## II.     Plaintiffs Have Established Article III Standing for Their Welfare Fund Claim

At the outset, the Court observes that Defendants' arguments in its motion dismiss for lack of standing fall into two distinct categories. At times, Defendants argue that under *Thole*, Named Plaintiffs have failed to show injury in fact as a matter of law. (*See* Defendants' Memorandum of Law ("Def. Br."), Dkt. 331, at 17–18 ("*Thole* is dispositive and Named Plaintiffs' additional prejudgment interest theory must be dismissed for lack of standing."); Defendants' Reply Memorandum of Law ("Def. Rep. Br."), Dkt. 333, at 2 ("The issue before this Court is whether

under controlling precedent from *Lujan* to *TransUnion*, Named Plaintiffs can satisfy their burden of establishing Article III standing. Named Plaintiffs cannot as a matter of law.").)  In other portions of their briefing, Defendants appear to contest underlying jurisdictional facts and direct this Court's attention to documents not previously in the record. (*See, e.g.*, Def. Br., Dkt. 331, at 17.)

As explained below, this Court interprets *Thole* as neither mandating a dismissal of Named Plaintiffs' remaining claims, nor overruling the Second Circuit's decision in *Trapani*.  Further, based on the pleadings and affidavit submitted by Named Plaintiffs, the Court finds that Named Plaintiffs have also satisfied the redressability and traceability prongs of Article III standing.

A.     ***Thole* Does Not Apply to Cases Where Benefits are Not Fixed**

Defendants' motion to dismiss relies largely on the Supreme Court's decision in *Thole*. The plaintiffs in *Thole* were two retired participants of a defined-benefit plan who alleged in a putative class action lawsuit that the plan's fiduciaries had breached their duties of loyalty and prudence by mismanaging the plan's assets.  *Thole*, 140 S. Ct. at 1618.  As retired, vested participants in this particular defined-benefit plan, the two plaintiffs were guaranteed to receive $2,198.38 and $42.26 per month, respectively, "regardless of the plan's value at any one moment and regardless of the investment decision of the plan's fiduciaries." *Id*.  "Of decisive importance" to the Court's decision was the fact that under the plaintiffs' defined-benefit plan, "retirees received a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions."  *Id.*  The Court held that since the plaintiffs had "received all of their monthly benefit payments" up to that point, and were "legally and contractually entitled to receive those same monthly payments for the rest of their lives," the plaintiffs lacked the "concrete stake" in the outcome of the lawsuit necessary to establish Article III standing.  *Id.* at 1618–19.  The Court further found that because the plaintiffs

"possess[ed] no equitable or property interest in the plan," they could not assert standing to sue based on injuries to the plan itself.  *Id.* at 1619–20.

Defendants argue that, as in *Thole*, Named Plaintiffs here cannot establish Article III standing because they have not been "denied any part of their defined benefit pension or any of the health benefits promised" by the Local 175 Welfare Fund, and therefore have no "concrete stake" in the outcome of this lawsuit.  (Def. Rep. Br., Dkt. 333, at 2.)  Thus, Defendants assert, "*Thole* is dispositive and [Named Plaintiffs'] welfare claims must be dismissed."  (Def. Br., Dkt. 331, at 18.)  This is incorrect.

*Thole* simply does not apply to this case because the benefits provided by the Local 175 Welfare Fund are critically different than those in *Thole*.  Though both cases nominally involved "defined benefit" plans, the amount of benefits to which the *Thole* plaintiffs were entitled and had begun receiving were fixed and guaranteed, whereas, here, Named Plaintiffs have credibly alleged, and supported with the affidavit of Local 175 Funds Administrator Anthony Franco (Affidavit of Anthony Franco, dated Nov. 23, 2021 ("Franco Aff."), Dkt. 332-6), that the Local 175 Welfare Fund's benefits are not fixed for the rest of Named Plaintiffs' lives, as in *Thole*, or even from one year to the next (*see id.* ¶¶ 34) (explaining that "benefits provided by the Welfare Fund are not contractually fixed" and that the trustees of the Local 175 Funds "are free to increase or reduce benefits provided . . . at any time").

In fact, Named Plaintiffs have demonstrated that their wages and the benefits provided by the Local 175 Welfare Fund fluctuated based on the fund's overall assets, such that Defendants' refusal to transfer an aliquot share of assets to the Local 175 Welfare Fund has resulted in concrete harm to Named Plaintiffs that is sufficient to establish their standing to bring this case.  *See Tandon*, 752 F.3d at 243 ("[I]f jurisdictional facts are placed in dispute, the court has the power

and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.").

As discussed below, this harm has materialized in at least two forms during the relevant period: (1) prevention of wage increases for Named Plaintiffs; and (2) decrease in the level of benefits provided to plan participants.[5] (*See* Plaintiffs' Memorandum of Law ("Pl. Br."), Dkt. 332, at 15–16; *see also* Franco Aff., Dkt. 332-6, ¶¶ 64–79.)

### 1. Named Plaintiffs have suffered harm in the form of lower wages

Named Plaintiffs allege that because Defendants refused to transfer the aliquot share of assets from the Local 1175 Fund to the Local 175 Fund, assets that would have been used to increase wages for Local 175 Fund participants were instead diverted to build the Local 175 Welfare Fund and to cover claims against it. (*See* Pl. Br., Dkt. 332, at 15–16; *see also* Am. Compl., Dkt. 53, ¶ 42.)

---

[5] Named Plaintiffs allege a third harm, *i.e.*, significant risk of the Welfare Fund's default. Seizing upon language in *Thole* indicating that defined-benefit-plan participants might have standing if the plan's trustees or administrators mismanaged the plan to such an extent that there was a substantially increased risk of failure, 140 S. Ct. at 1621–22, Named Plaintiffs contend that Defendants' failure to transfer assets owed to the Local 175 Funds "enhanced the risk of [the Local 175 Welfare Fund's] default," *i.e.*, "precisely the scenario presented" in the hypothetical scenario in *Thole*. (*See* Pl. Br., Dkt. 332, at 18.) However, like the plaintiffs in *Thole*, Named Plaintiffs have not alleged in the amended complaint that Defendants' failure to transfer the aliquot share of assets created a substantially higher risk that the Local 175 Welfare Fund would fail. In fact, the closest the amended complaint gets to making an allegation of plan failure was claiming that transferring the aliquot share of assets will "increase the reserves necessary to insure that Local 175 Fund's viability." (Am. Compl., Dkt. 53, ¶ 42.) Such a "bare allegation of plan underfunding does not itself demonstrate a substantially increased risk" of plan failure. *Thole*, 140 S. Ct. at 1622. The Court therefore does not find that Named Plaintiffs have sufficiently alleged that Defendants' actions have created a "substantially increased risk" of failure for Local 175 Welfare Fund to satisfy the injury-in-fact requirement. But this does not affect the Court's finding that Named Plaintiffs have standing in this case, given the other harms that the Court finds sufficiently established.

The allegations and affidavit submitted by Named Plaintiffs establish the following. Due to Defendants' refusal to transfer the aliquot share of funds, the Local 175 Welfare Fund started in 2005 with $0 in operating assets. (*See* Pl. Br., Dkt. 332, at 3; Franco Aff., Dkt. 332-6, ¶¶ 54, 84.)[6] With no assets to generate investment returns, the Local 175 Welfare Fund had to be funded through employer contributions. (Franco Aff., Dkt. 332-6, ¶ 56.) Dedicating "all or nearly all" of the employer contributions to the Local 175 Welfare Fund was the only "realistically possible" way to build the Local 175 Welfare Fund. (*Id.* ¶¶ 55, 69.)[7] Any increases in employer contributions that were not allocated to the Local 175 Funds could legally only be used for union dues or to increase worker pay. (*Id.* ¶ 49.) Named Plaintiffs further allege that the administrators of the Local 175 Welfare Fund had "wanted to increase worker [w]ages" on several occasions, but

---

[6] Paragraph 23 of Franco's affidavit reads: "Investment returns on assets held by the Pension Fund are automatically allocated to the Welfare Fund." The Court is unsure whether this is a typographical error, and that the sentence should instead read: "Investment returns on assets held by the Pension Fund are automatically allocated to the Pension Fund." But the upshot remains the same: the Local 175 Welfare Fund was substantially harmed by Defendants' failure to transfer the aliquot share of funds in 2005.

[7] Although Franco claims that the trustees of the Local 175 Fund dedicated "all or nearly all" of the employer contributions to the Welfare Fund (at the expense of higher wages for union members), the table he submitted suggests otherwise. (*See* Paving and Plant Allocation Chart ("Allocation Chart"), attached as Exhibit A to Franco Aff., Dkt. 332-7.) For example, in 2010, employer contribution for plant workers increased by 3.5% which represented $2.24. $1.00 of that amount was allocated to the Local 175 Welfare Fund and $1.24 to an increase in wages. (*See id.*) In 2012, $0.75 of a $2.40-increase in employer contribution was allocated to the Local 175 Welfare Fund, while $0.90 was allocated to wages, with the remaining $0.75 allocated elsewhere. (*See id.*) The Court's analysis, however, is ultimately not affected by this seeming discrepancy for two reasons. First, the Allocation Chart only dates to 2010, and it is reasonable to infer from the pleadings that the Local 175 Welfare Fund needed a greater percentage of employer contribution in the years immediately following 2005, and that by 2010, the amount allocated to the Local 175 Welfare Fund had decreased. Second, and more importantly, Named Plaintiffs do not need to show that they received zero increases in wages from 2005 to 2014. They need only sufficiently allege that Defendants' refusal to transfer the funds prevented some increase in their wages, which is the alleged concrete injury.

were unable to do so because they needed to allocate funds to the Local 175 Welfare Fund.  (*Id.* ¶ 73.)

While Defendants argue that this Court should not rely on Mr. Franco's affidavit, (*see* Def. Rep. Br., Dkt. 333, at 5 n.4), and try to highlight what they perceive as weaknesses in his affidavit (*see id.*, at 2, 6), they have failed to submit any convincing evidence that contradicts his allegations that Named Plaintiffs were denied wage increases as a result of the failure to transfer the aliquot share of assets.  Accordingly, on the present record, the Court finds that Named Plaintiffs have sufficiently alleged that the Defendants' refusal to transfer the aliquot share of welfare fund assets, which led to initial underfunding of the Local 175 Welfare Fund, harmed Named Plaintiffs by denying them an increase in their wages.  (*Id.* ¶¶ 34, 38.)

### 2.   Named Plaintiffs suffered harm in the form of decreased benefits

The second type of harm that Named Plaintiffs have identified is a decrease in health benefits offered to plan participants.  In *Thole*, the plaintiffs lacked standing because even if they "were to *lose* this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny less."  *Thole*, 140 S. Ct. at 1619.  Defendants in this case seize on this language from *Thole* and frame it as a bright-line test: "Named Plaintiffs do not claim they were denied any of the benefits promised under the Local 175 Welfare Plan. . . . As a result, they have no concrete stake in the litigation."  (Def. Br., Dkt. 331, at 18.)  Indeed, Defendants reiterate this notion throughout their briefing.  (*See* Def. Br., Dkt. 331, at 14, 17, 19–20, 23–24, 27.)

Defendants' attempts to apply this bright-line test to Named Plaintiffs' welfare fund claim are unavailing for several reasons.  First, Defendants' position that there have been no allegations of denial of benefits appears to be contradicted by Named Plaintiffs' assertion that around 2012,

13

the administrators for the Local 175 Funds raised the number of years of service needed to qualify for retiree medical benefits from 10 years to 15 years in order to keep the Local 175 Welfare Fund solvent. (*See* Pl. Br., Dkt. 332, at 4; Franco Aff., Dkt. 332-6, ¶¶ 75–76.) Confusingly, Defendants repeat this claim in their reply brief, asserting that "neither Named Plaintiffs nor [their affiant] Franco allege that Named Plaintiffs were denied any benefits to which they were entitled under the Local 175 Pension Plan or Welfare Plan," even after Defendants had a chance to review Named Plaintiffs' briefing and the Franco Affidavit. (Def. Rep. Br., Dkt. 333, at 6 n.5; *see also id.*, at 2, 10.)[8]  To the extent Defendants are challenging the legal sufficiency of the allegations, the Court finds that Named Plaintiffs have plainly made a sufficient allegation that they were denied benefits. The fact that Named Plaintiffs in fact alleged this type of harm is important since the district court in *Thole* was clear that the plaintiffs "d[id] not allege that any Plan beneficiary has suffered a decrease in benefits" because of the alleged misconduct of the defendant. *See Adedipe v. U.S. Bank, Nat'l Ass'n*, No. 13-CV-2687 (JNE) (JJK), 2015 WL 11217175, at *4 n.4 (D. Minn. Dec. 29, 2015).

On the other hand, to the extent that Defendants and Named Plaintiffs' dueling positions point to a disagreement on jurisdictional facts, this Court finds in favor of Named Plaintiffs, who have supported their allegations about a decrease in welfare benefits with Franco's affidavit. (Franco Aff., Dkt. 332-6, ¶¶ 1, 75–76.) By contrast, Defendants did not respond in their reply brief

---

[8] Defendants' test focuses on whether plan participants were denied benefits already "promised under the Local 175 Welfare Plan." (Def. Br., Dkt. 331, at 18.) But Named Plaintiffs claim that "benefits provided by the Welfare Fund are not contractually fixed" and instead the trustees "are free to increase or reduce benefits provided to [plan participants] at any time." (Franco Aff., Dkt. 332-6, ¶ 34.) It is of course impossible for Named Plaintiffs to have been denied benefits promised by the 175 Welfare Fund if that Fund never promises benefits to begin with. The root of this discrepancy may be that Defendants are fashioning a test from *Thole*, even though the plans here and in *Thole* are sufficiently different that applying such a test to Named Plaintiffs does not guide the inquiry on injury in fact.

to this allegation that the 175 Welfare Fund had to reduce benefits, nor did they submit any evidence to contest Fund Administrator Franco's statements. Thus, on the record currently presented, this Court credits Named Plaintiffs' allegation that there was a reduction in health benefits in 2012, and finds that this change in benefits is enough to satisfy the injury in fact requirement of Article III.

In sum, *Thole* simply has no application in this case, where the amount of the benefits to which plan participants are entitled is neither fixed nor guaranteed, and it does not foreclose standing where, as here, Named Plaintiffs have credibly alleged and demonstrated concrete harm caused by Defendants' alleged refusal to transfer funds in violation of ERISA.

## B. *Thole* Does Not Apply to Fund-to-Fund Transfer Cases

As a general matter, the Court also is not convinced that *Thole*, a case concerning allegations of fund mismanagement, applies to cases involving fund-to-fund transfers. That *Thole*'s holding is limited to cases involving allegations of fund mismanagement is apparent throughout the Supreme Court's decision. First, the Court repeatedly noted that the basis of the lawsuit is alleged mismanagement by the fund's trustees, *see* 140 S. Ct. at 1618, 1619, 1621—a fact that informs key parts of the Court's analysis. For example, in rejecting the plaintiffs' primary argument that ERISA-regulated pension and welfare plans, like the one plaintiffs participated in, were analogous to private trusts, the Supreme Court reasoned that mismanagement has less of an impact on defined-benefit plans, which are "more in the nature of a contract," than on private trusts, where "the value of the trust property and the ultimate amount of money received by the beneficiaries will typically depend on how well the trust is *managed*." *Id*. at 1619–20 (emphasis added). This reasoning suggests that standing, in fact, can be established where the alleged misconduct could harm a defined-benefit plan's overall financial health and viability. Indeed, the

Supreme Court expressly left open the possibility that participants in a defined-benefit plan could have standing if they "plausibly and clearly claim that the alleged mismanagement of the plan substantially increased the risk" of the plan's failure—a claim similar to Named Plaintiffs' claim that Local 1175's failure to transfer the proper amount of funds owed to Local 175 could cause that plan to be underfunded and fail. *Id.* at 1621–22. Thus, because this Court finds that the rationale in *Thole* cannot be divorced from the specific context of the mismanagement claims (and the degree of mismanagement) alleged there, it declines to extend *Thole*'s holding to this case, where the dispute concerns a fund-to-fund transfer and the claim goes to the fund's ability to pay benefits and the level of those benefits.[9]

A closer analysis of the Supreme Court's earlier Article III standing jurisprudence, which *Thole* cites and relies on, makes it even clearer that *Thole* was not meant to apply to fund-to-fund transfer cases. One of those cases is *Spokeo, Inc. v. Robins*. *See Thole*, 140 S. Ct. at 1620. In *Spokeo*, the Supreme Court considered whether the plaintiff suffered concrete harm when the defendant-operator of a "people search engine" website collected and disseminated inaccurate information about the plaintiff. *See Spokeo*, 578 U.S. at 333. The Supreme Court concluded that even if the defendant violated the procedural requirements of the Fair Credit Reporting Act, "a bare procedural violation, divorced from any concrete harm" cannot satisfy the injury in fact requirement of Article III. *Id.* at 341. Similarly, the Supreme Court in *Lujan* rejected a lower court's decision that Article III standing can be conferred through a "procedural injury" without any concrete harm. *Lujan*, 504 U.S. at 572–73. In light of the concerns expressed in *Spokeo* and

---

[9] In fact, the Supreme Court in *Thole* acknowledged that plaintiffs who are defined-benefit plan participants are not required to show for *every* ERISA-related lawsuit that they suffered a loss to establish Article III standing. *See Thole*, 140 S. Ct. at 1621 n.1 (explaining that the holding does not concern suits under 29 U.S.C. § 1132(a)(1)(A)).

*Lujan* about conferring subject matter jurisdiction based solely on procedural violations of federal statutes, this Court finds that there is meaningful difference for standing purposes between ERISA lawsuits claiming mismanagement by fund administrators like *Thole* and lawsuits like this one complaining about inadequate fund-to-fund transfers that affect the plaintiffs' benefits. Put differently, the allegations that Defendants in this case did not transfer millions of dollars for several years to the Local 175 Funds is far from the type of "bare procedural violation, divorced from any concrete harm" that the Supreme Court has warned against in *Spokeo* and *Lujan*.

**C.    *Trapani* Has Not Been Overruled by *Thole* or Any Other Recent Supreme Court Decision**

Defendants argue that *Thole* is the latest installment of "30 years of controlling case law" that effectively overturns the Second Circuit's decision in *Trapani v. Consolidated Edison Emps.' Mut. Aid Soc.*, 891 F.2d 48 (2d Cir. 1989). The Court disagrees.

District courts are "bound by the decisions of the Supreme Court . . . and those of the Circuit Court of Appeals in their own circuit." *Cont'l Sec. Co. v. Interborough Rapid Transit Co.*, 165 F. 945, 959–60 (C.C. S.D.N.Y. 1908); *see also Jenkins v. United States*, 386 F.3d 415, 418 (2d Cir. 2004) (explaining that district courts are bound to apply the law of the relevant circuit court). This rule applies unless there is an intervening Supreme Court or *en banc* panel circuit decision that "casts doubt on [the] controlling precedent." *In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 154 (2d Cir. 2015). Although "the intervening decision need not address the precise issue already decided" by the circuit, there must be a "conflict, incompatibility, or inconsistency" between the Supreme Court's decision and circuit precedent. *Id.* at 155. When the Second Circuit considers whether its own precedent has been overturned by a Supreme Court decision, it "approach[es] this inquiry humbly," in order to avoid "diminish[ing] respect for the authority of three-judge panel decisions and opinions." *United States v. Afriyie*, 27 F.4th 161, 168

(2d Cir. 2022) (internal quotation marks and citation omitted).  Therefore, a district court must proceed even more cautiously in deciding whether an intervening Supreme Court decision overrules Second Circuit precedent, out of respect for the overall structure of the federal judiciary. Unless "a subsequent decision of the Supreme Court so undermines [circuit precedent] that it will almost inevitably be overruled," the district court must follow the circuit court's decision. *Austin v. United States*, 280 F. Supp. 3d 567, 572 (S.D.N.Y. 2017).

Defendants ask the Court to disregard the Second Circuit's decision in *Trapani*, which presents facts strikingly similar to this case: plaintiffs were unionized Con Edison employees who had to switch from one health and welfare benefit plan to a new plan after their union entered into a new collective bargaining agreement.  891 F.2d at 49.  The *Trapani* plaintiffs sued the old plan for breach of fiduciary duty to effectuate a transfer of the aliquot share of assets held by the old plan to the new plan.  *Id.*  After weighing the equitable considerations, the Second Circuit held that the successor fund was entitled to the aliquot share of the assets, but notably did not discuss the plaintiffs' standing to bring the lawsuit.  *Id.* at 51.

Named Plaintiffs argue that under *Trapani*, plan participants who allege that a previous fund failed to transfer an aliquot share of assets to the successor fund have "the necessary standing, absent proof of individual monetary loss, as a matter of law."  (*See* Pl. Br., Dkt. 332, at 18 (arguing that the *Trapani* panel "implicitly [found] standing" when it held that "welfare fund participants could sue to compel a fund-to-fund asset transfer.").)  Defendants respond that *Trapani* is not applicable because the Second Circuit did not discuss Article III standing in that opinion, and contend that *Trapani* has effectively been overruled by a series of Supreme Court decisions from *Lujan* to *Thole*.  (Def. Rep. Br., Dkt. 333, at 9.)

The Court rejects Defendants' argument and finds that *Trapani* is still good law in this circuit. Because *Thole* does not directly address cases involving fund-to-fund transfers, there is no "conflict, incompatibility, or inconsistency" that warrants overturning *Trapani*. Defendants' position is not helped by framing *Thole* as one installment in a series of "30 years of controlling case law" that purportedly contravenes *Trapani*. As explained earlier, the Court finds that *Spokeo* and *TransUnion* are both inapposite because a benefits plan's refusal to transfer millions of dollars to a successor pension or welfare plan can hardly be characterized as a "procedural violation" of a statute. *See Spokeo*, 578 U.S. at 341.[10] Although Defendants correctly point out that *Trapani* was decided before *Lujan* and that the Second Circuit did not explicitly address standing in its opinion in *Trapani*, *see* Def. Rep. Br., Dkt. 333, at 9, it would be presumptuous for this Court to assume that the Second Circuit overlooked the issue of Article III standing when ruling in the plaintiffs' favor in *Trapani*, especially in light of the Second Circuit's longstanding recognition that the lack of subject matter jurisdiction is an issue that "may be raised *sua sponte* by the district court or by a federal appellate court." *See All. of Am. Insurers v. Cuomo*, 854 F.2d 591, 605 (2d Cir. 1998) (citations omitted); *see also Afriyie*, 27 F.4th at 168 (2d Cir. 2022) (directing courts to "approach the inquiry humbly" when considering whether Second Circuit precedent has been overturned by the Supreme Court). Instead, this Court interprets the silence in *Trapani* on Article III standing as reflecting the panel's implicit recognition that plaintiffs who alleged that millions of dollars of

---

[10] Defendants' argument that *Trapani* was undermined by the Supreme Court's decision in *Local 144 Nursing Home Pension Fund v. Demisay*, 508 U.S. 581 (1993) is no more persuasive now than when this argument was rejected by Judge Ross. (*See* Def. Rep. Br., Dkt. 333, at 9; *see also* 2012 Order, Dkt. 72, at 8 n.7.) As Judge Ross explained in the 2012 Order, the Supreme Court in *Demisay* abrogated an earlier Second Circuit decision that *Trapani* relied on, but it did so on grounds "that did not undermine the reasoning that the Second Circuit applied in *Trapani*." (2012 Order, Dkt. 72, at 8 n.7.)

funds had been wrongly withheld from their pension and welfare fund for years had suffered injury and thus had a concrete stake in the outcome of the litigation.

Accordingly, this Court cannot conclude that *Thole* or any of the other cases[11] cited by Defendants "so undermines [the] Second Circuit precedent that it will almost inevitably be overruled." *Austin*, 280 F. Supp. 3d at 572 (brackets in original omitted).

### D. Named Plaintiffs Have Satisfied the Traceability and Redressability Requirements of Article III Standing for the Welfare Fund Claim

Defendants further argue that Named Plaintiffs lack Article III standing because they cannot satisfy either the traceability or redressability prongs. Although Defendants present several different arguments on these points,[12] the core of Defendants' argument is that "there is no causal

---

[11] For several reasons, Defendants' appeal to *Gonzalez de Fuente v. Preferred Home Care of New York, LLC*, 858 Fed. App'x. 432 (2d Cir. 2021) (summary order), does not alter this Court's analysis. First, *Gonzalez de Fuente* is a summary order, "which, of course do[es] not provide binding authority." *Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 701–02 n.4 (2d Cir. 2009). Second, *Gonzalez de Fuente* presented facts similar to *Thole*, and can be distinguished on the same grounds: the plaintiffs in both cases raised allegations of mismanagement, not allegations about the failure to execute a fund-to-fund transfer. Finally, the plaintiffs in *Gonzalez de Fuente* "conced[ed] that they ha[d] not claimed concrete harm under ERISA." *Gonzalez de Fuente v. Preferred Home Care of New York, LLC*, No. 18-CV-6749 (AMD) (PK), 2020 WL 5994957, at *3 (E.D.N.Y. Oct. 9, 2020). By contrast, as discussed *supra*, Named Plaintiffs have supplemented their specific allegations as to the ways in which they were harmed by Defendants' refusal to transfer the aliquot share of assets in an affidavit filed in support of their claims. (*See* Franco Aff., Dkt. 332-6, ¶¶ 54–79.)

[12] Defendants also argue that because ERISA "does not mandate particular benefits or increased take-home pay," the welfare claim should be dismissed for failure to satisfy the traceability and redressability element of Article III. (*See* Def. Rep. Br., Dkt. 333, at 3.) Defendants seem to be arguing that decreased take-home pay, as a matter of law, cannot be the basis of a cause of action under ERISA. However, "absence of a valid (as opposed to arguable) cause of action does not implicate subject matter jurisdiction," but rather is an argument that plaintiffs have failed to state a claim. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (internal citation omitted). In any event, Defendants' argument fails because the lower benefits here are the injury for the welfare fund claim, and the cause of action is 29 U.S.C. 1103, as interpreted in *Trapani*. (*See* Pl. Br., Dkt. 332, at 8; *see also* 2012 Order, Dkt. 72, at 10–11.) As explained above, the Court finds that *Trapani* has not been overruled, and thus Named Plaintiffs can invoke the decision as supporting both standing and the sufficiency of their cause of action.

nexus linking" Defendants' actions to the purported injuries of decreased wages and benefits, and that because the Court has no control over collective bargaining agreement negotiations, no decision from this Court can redress these injuries. (Def. Br., Dkt. 331, at 26–27.)

Defendants are incorrect. Named Plaintiffs have met the traceability standard by adequately explaining through affidavits the links between Defendants' refusal to transfer the aliquot share of assets and the purported harms of reduced benefits and inability to increase take-home pay. To briefly summarize those links: the Local 175 Welfare Fund is funded primarily from a combination of investment returns on assets and allocations from employer contributions (*see* Franco Aff., Dkt. 332-6, ¶ 9); the Local 175 Welfare Fund started with $0 in operating assets in 2005 because it did not receive the transfer from the Local 1175 Welfare Fund (*see id.* ¶¶ 54, 84); with no initial assets to generate investment returns, the Local 175 Welfare Fund had to be funded solely through employer contributions (*see id.* ¶ 56); the only two options to make sure the Local 175 Welfare Fund had assets sufficient to pay all incurred claims was to allocate additional employer contributions to the Welfare Fund or to reduce benefits offered to the beneficiaries (*see id.* ¶ 36); the administrators of the Local 175 Funds ultimately exercised both options to sustain the Local 175 Welfare Fund (*see id.* ¶¶ 56, 75–77).

Through this chain of events presented by Named Plaintiffs, the alleged harm of lower benefits and decreased wages can be traced to Defendants' decision not to transfer the aliquot share of assets. *See Dennis*, 343 F. Supp. 3d at 156. The fact that this causal link depends on decisions of the administrators of the Local 175 Funds does not extinguish or sever the causal nexus, because the administrators had limited options to address the underfunding of the Local 175 Welfare Fund, any of which resulted in harm to Named Plaintiffs. (*See* Franco Aff., Dkt. 332-6, ¶ 36 ("[T]he

Fund has two options.  It must either ask Local 175 to allocate additional compensation to the Welfare Fund, or it must reduce benefits.").)

Defendants' principal argument on redressability is that the administrators of Local 175 Welfare Fund have "unfettered" decision-making power and they operate as "independent actors." (Def. Br., Dkt. 331, at 26.)  The requested relief, argue Defendants, "is far too attenuated, speculative, and contingent upon the discretionary acts of third parties not before this Court" in order to satisfy the redressability requirement.  (Def. Rep. Br., Dkt. 333, at 3.)  Defendants also point out that this Court cannot dictate how Local 175 will negotiate its next collective bargaining agreement ("CBA"), implying that the Court would not know whether wages and benefits will be impacted even if assets were transferred from the Local 1175 Funds to the Local 175 Funds.  (*See* Def. Br., Dkt. 333, at 27.)

Defendants' suggestion that there is no way to know whether the Local 175 Welfare Fund would use any monetary judgment in its favor to redress the alleged injuries is unfounded. According to Named Plaintiffs, defined-benefit plan administrators are bound by statute to use the assets of the fund for the benefit of the plan participants or their beneficiaries (Franco Aff., Dkt. 332-6, ¶¶ 47–51), and the Local 175, in particular, follows the "typical [method] in the industry" of negotiating CBAs in such a way that the available funding for contributions to the Local 175 Welfare Fund and take-home pay for workers "are all interconnected" (*see* Affidavit of Charles Priolo, dated Aug. 13, 2018, Dkt. 332-4, ¶¶ 18–19).  In fact, the administrators of the Local 175 Funds are kept in check not only by legal requirements and their adherence to typical industry practice in CBA negotiations, but also by the "regulatory phalanx" they would face if they were to misuse the funds.  *See Thole*, 140 S. Ct. at 1621 (explaining that employee benefit and pension funds are closely regulated by the U.S. Department of Labor, other fiduciaries, employers, and

even state and criminal law enforcement agencies). Therefore, it is not difficult to conclude that any court order of asset transfer or award of additional prejudgment interest to the Local 175 Funds "likel[y]…would, in principle, redress the alleged injury alleged." *See Heldman on Behalf of T.H.*, 962 F.2d at 157.

### III.   Plaintiffs Have Established Article III Standing for Their Pension Fund Prejudgment-Interest-Adjustment Claim

Defendants also move to dismiss Named Plaintiffs' remaining claim for additional prejudgment interest on the pension fund asset transfer. Defendants argue that Named Plaintiffs lack an equitable or property interest in the Local 175 Fund and that therefore the prejudgment interest claim "must be dismissed as a matter of law." (Def. Rep. Br., Dkt. 333, at 12.) Defendants also contend that Named Plaintiffs cannot satisfy the traceability and redressability elements for their prejudgment interest claim because "[n]either the Court nor the Named Plaintiffs can predict in hindsight what investment decision the Local 175 Pension Fund trustees would have made." (Def. Br., Dkt. 331, at 27–28.) Named Plaintiffs argue in response that for Defendants to be successful on this claim, Named Plaintiffs would have had to lose standing sometime between now and 2013 or 2014, when Defendants transferred the pension fund assets and a tranche of prejudgment interest, respectively. (*See* Pl. Br., Dkt. 332, at 20.)

Article III standing "may be raised by a party, or by a court on its own initiative, at any stage in the litigation." *Carter*, 822 F.3d at 56. Throughout the litigation, "[a]n actual controversy must be extant" for plaintiffs to have standing. *Davis v. FEC*, 554 U.S. 724, 732–33 (2008). "While the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when* the suit was filed." *Davis*, 554 U.S. at 734 (emphasis added) (citation omitted); *see also Mhany Mgmt, Inc. v. Cnty. of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016) ("We evaluate Plaintiffs'

standing as of the outset of the litigation." (internal quotation marks omitted)). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis*, 554 U.S. at 734 (internal quotation marks omitted).

In its 2016 Order, this Court held that because Named Plaintiffs have standing to compel the transfer of the aliquot share of assets from the Local 1175 Pension Fund, they "necessarily" have standing to "enforce the correction calculation" of the amount to be transferred. (2016 Order, Dkt. 231, at 27.) The Court did not grant summary judgment for Named Plaintiffs with respect to the prejudgment interest, finding that there was an issue of fact about whether the Local 175 Pension Fund's investment rate of return would have been higher had it timely received the asset transfer, or whether the investment strategy would have been unchanged, and thus whether additional prejudgment interest beyond the $449,273 in prejudgment interest is warranted for the assets already transferred by the Local 1175 Pension Fund. (2016 Order, Dkt. 231, at 26.)

Defendants apparently do not contest the Court's previous finding that Named Plaintiffs have a concrete interest in enforcing a Section 1415 transfer "to ensure that the [Local 175 Pension Fund] has received all assets to which it is statutorily entitled." (*See* 2016 Order, Dkt. 231, at 27; Def. Br., Dkt. 331, at 17 n.3.) In that order, the Court observed that it would be "an absurd result" if Named Plaintiffs could not consequently have Article III standing to ensure the proper amounts be transferred. (*See* 2016 Order, Dkt. 231, at 27.) By the same reasoning, Named Plaintiffs must also have Article III standing to seek what they allege is the proper calculation of prejudgment interest, which after all is "an element of [the plaintiff's] complete compensation" for an ERISA claim. *See Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 53–54 (2d Cir. 2009) (quoting *Jones v. UNUM Life Ins. Co. of America*, 223 F.3d 130, 137 (2d Cir. 2000)). The Court agrees with

Named Plaintiffs that "part and parcel of a correct damages calculation[] is determination of the correct amount of prejudgment interest on those damages." (Pl. Br., Dkt. 332, at 21.)

Defendants assert, without explanation, that Named Plaintiffs' "new theory of injury fails as a matter of law in light of *Thole* as Named Plaintiffs have no equitable or property interest in the Local 175 Pension Fund." (Def. Rep. Br., Dkt. 333, at 12.) However, as the Court has explained, the analysis in *Thole* regarding property and equitable interest is only relevant to the extent that the Supreme Court was addressing an argument that those plaintiffs raised about asserting standing on behalf of the fund itself. (*See supra* at 9–10.) Defendants utterly fail to explain why a lack of an equitable and property interest in the Local 175 Pension Fund should impact whether Named Plaintiffs have standing to seek now what they contend is an accurate assessment of prejudgment interest. Furthermore, for the same reasons previously discussed with respect to Named Plaintiffs' welfare fund claims, the Court does not find this aspect of *Thole* relevant to Named Plaintiffs' standing with respect to their pension fund claims or their related claim for prejudgment interest.

In support of their argument, Defendants cite to *Hughes Aircraft Co. v. Johnson*, 525 U.S. 432 (1999) and *John Blair Commc'n Profit Sharing Plan v. Telemundo Grp.*, 26 F.3d 360 (2d Cir. 1994). (*See* Def. Rep. Br., Dkt. 333, at 13.) Yet neither case has any bearing on whether a party has standing to seek adjustment of prejudgment interest for a fund-to-fund transfer. In *Hughes*, the Supreme Court held that under Section 1002, plan beneficiaries are not entitled to "surplus assets"[13] generated by their ERISA plan trustees. 525 U.S. at 437, 440–41. The Supreme Court's statutory interpretation of Section 1002 in *Hughes* is irrelevant to the question of what interest rate

---

[13] The term "surplus assets" as used in *Hughes*, refers to the difference in value between a beneficiary plan's assets and the actuarial or present value of the accrued benefits. *See Hughes*, 525 U.S. at 436.

Named Plaintiffs are entitled to for a claim brought under Section 1415, let alone the question of whether Named Plaintiffs can establish standing to pursue additional prejudgment interest.

The Second Circuit's decision in *John Blair* involved a more analogous fact pattern: a spun-off pension fund that was seeking transfer of appreciation and interest from its predecessor fund, and surplus income earned by the predecessor fund while it delayed transfer of the assets to the new fund. *See* 26 F.3d at 362–63. Defendants draw attention to *dicta* in *John Blair* that the plaintiffs had no concrete interest in surplus income of the predecessor fund because they were guaranteed to receive their promised benefits at retirement. (*See* Def. Rep. Br., Dkt. 333, at 13 (citing *John Blair*, 26 F.3d at 366).) But again, Defendants fail to explain how that relates to whether Named Plaintiffs have standing to challenge the calculation of prejudgment interest. (*See* Def. Rep. Br., Dkt. 333, at 13.)[14] And the Court can discern no connection. Therefore, neither *Hughes* nor *John Blair* supports Defendants' position that Named Plaintiffs lack standing to seek an accurate calculation of prejudgment interest.

Finally, Defendants claim that the alleged harm related to the additional prejudgment interest is neither traceable nor redressable because Named Plaintiffs "cannot establish that any inability or refusal to invest in stocks was fairly traceable to Defendants" as opposed to the result

---

[14] To be clear, Named Plaintiffs are not seeking to recoup any surplus income the Local 1175 Pension Fund earned while retaining the aliquot share of assets. Instead, they seek to use the performance of the Local 1175 Fund as a proxy benchmark to calculate the opportunity cost to Local 1175 Funds' years-long delay in transferring the assets to Local 175 Funds. (*See* Pl. Br., Dkt. 332, at 2–3.) To the extent that Defendants are asking the Court to dismiss Named Plaintiffs' claim to an adjustment of prejudgment interest by challenging the theory of recalculation, such a challenge is not an argument on Article III standing, and the Court declines to address that argument in this order. *See Johannes Baumgartner Wirtschafts-Und Vermogensberatung GmbH v. Salzman*, 969 F. Supp. 2d 278, 290 (E.D.N.Y. 2013) ("[A] Court need not entertain an argument that was not briefed").

of decisions made by the fiduciaries of the Local 175 Pension Fund. (*See* Def. Rep. Br., Dkt. 333, at 13–14; Def. Br., Dkt. 331, at 27–28.)

Here again, Defendants are trying to apply the Article III standing requirements to the theory underpinning Named Plaintiffs' calculation of a higher prejudgment interest rate, rather than to their legal claim for such interest. Named Plaintiffs have demonstrated that Defendants' refusal to transfer Pension Fund assets can be traced to decreased pension benefits to Local 175 Plan participants. (*See* Franco Aff., Dkt. 332-6, ¶¶ 80–86.) Specifically, they have submitted an affidavit attesting to the fact that eligibility for retirement benefits was changed, and that this change was to allow time for the Local 175 Pension Fund to accumulate assets. (*See id.* ¶¶ 85–86.) The Court's analysis on redressability of the welfare claim also applies here to the pension claim, as administration of the Local 175 Pension Fund is also subject to legal and regulatory restrictions. In sum, relief in the form of either the transfer of assets or an additional sum of prejudgment interest granted to the Local 175 Funds will likely be used to redress the alleged injuries.

## CONCLUSION[15]

For the reasons stated above, the Court finds that Plaintiffs have Article III standing to pursue their pension fund prejudgment-interest-adjustment claim and their welfare fund claim. The stay on expert discovery is now lifted and the parties are ordered to adhere to the discovery schedule set forth in the April 28, 2022 Docket Order.

---

[15] As the Court has determined that Named Plaintiffs have Article III standing to proceed on the remaining claims, this order need not, and does not, address the parties' arguments on substitution of plaintiffs and repleading of claims.

SO ORDERED.


/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: June 2, 2022
          Brooklyn, New York